Colleen R. Smith (ISB No. 10023)
Jacqueline K. Sahlberg (ISB No. 11031)
Stris & Maher LLP
1601 K Street NW, Suite 1050
Washington, DC 20006
T: 202-800-5749
csmith@stris.com
jsahlberg@stris.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**
**SOUTHERN DIVISION**

| | |
|---|---|
| LANDON HELMS, KAIYA ROBERTSON, JAYDA BUSHAY, and NANETTE NOVAK-KLOTZ,<br><br>Plaintiffs,<br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,<br><br>Defendant. | Case No. 26-cv-568<br><br>**COMPLAINT**<br><br>**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION REQUESTED**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Landon Helms, Kaiya Robertson, Jayda Bushay, and Nanette Novak-Klotz, by and through their attorneys, bring this civil action for damages and allege as follows:

## I. INTRODUCTION

1. Plaintiffs are all Boise State University ("BSU") students and members of BSU's cross country and/or track and field teams. They all graduated from high school in 2022. They bring this action to challenge the application of Defendant National Collegiate Athletic

Association's ("NCAA") Seasons of Competition Rule contained in NCAA Bylaw 12.6 as applied to them.

2. In June 2026, the NCAA changed this Rule. The prior Rule (the "Four-in-Five Rule"), which applied for decades, provided that a student-athlete's eligibility clock starts when the athlete enrolls full-time at any college and the athlete then has five years to compete in up to four seasons. In June 2026, the NCAA suddenly changed this rule to allow all student-athletes to compete for five seasons within a five-year continuous period (the "Five-in-Five Rule"). However, the NCAA inexplicably carved out a single exception to the general rule that all athletes may now compete for five seasons: members of Plaintiffs' 2022 high school graduation class who did not sit out a full season.

3. The NCAA's application of this bylaw to Plaintiffs unfairly limits the number of meets they can participate in during their five-year eligibility window and unjustifiably restrains their ability to earn money through use of their name, image, and likeness ("NIL") connected to their work as Division I athletes.

4. NCAA athletes have a reasonable expectation that they will be treated fairly by the NCAA and that NCAA rules will be applied consistently, regardless of the year in which they graduated from high school. For the last four years, 2022 high school graduates have been competing against older, stronger, and more experienced players allowed five (and even six) seasons of competition due to a Covid-era waiver granted to all athletes graduating high school and enrolling in college between 2017 and 2020. Now, the student-athletes who graduated high school after them will also be given five seasons to compete, develop their athletic abilities, earn NIL royalties, develop their personal brand, and gain exposure to potential professional sponsors.

In short, the NCAA has denied Plaintiffs the same opportunities that those graduating before them received and that those graduating after them will receive.

5. The unfairness of this disparate treatment by the NCAA cannot be overstated. Division I athletics is extraordinarily competitive. Plaintiffs compete not only for podium finishes and championships, but also for the limited professional and sponsorship opportunities available after college. Competing at the Division I level provides the best—and, in many cases, the only—opportunity to develop their athletic abilities, gain national exposure, and demonstrate their potential to professional teams and sponsors. Yet the NCAA has given Plaintiffs' peers 25% more opportunities to compete at this level: 25% more opportunities to improve, 25% more opportunities to gain exposure, and 25% more opportunities to build their reputations and pursue professional careers.

6. Plaintiffs are ready, able, and expected to compete in the upcoming 2026 cross-country season and/or 2026–27 indoor track-and-field season. Each Plaintiff is already on campus, attending classes, pursuing a degree, and training with their respective BSU teams. But for the NCAA's arbitrary eligibility restriction, Plaintiffs would compete for BSU in the coming weeks and months.

7. Plaintiffs seek immediate injunctive relief along with this Complaint. Immediate injunctive relief would preserve Plaintiffs' ability to compete during the 2026–27 academic year and the substantial athletic, professional, and economic opportunities that come with that competition. Plaintiffs would have the opportunity to continue developing their athletic abilities, compete at the highest level of their sports, build their athletic reputations, enjoy competing alongside fellow student-athletes in the unique collegiate environment, and pursue potential professional careers—including, for some Plaintiffs, their aspirations to compete in the 2028 Los

Angeles Olympic Games. They would also remain able to receive revenue-sharing payments from BSU and pursue third-party agreements compensating them for the use of their NIL.

8. Courts around the country have already granted temporary restraining orders and preliminary injunctions permitting similarly situated Division I student-athletes to compete during the 2026–27 academic year. This Court should do the same. Indeed, the circumstances of these Plaintiffs make the case for immediate relief particularly compelling.

9. All four Plaintiffs are already on campus and training with their respective teams, and all four retain eligibility to compete in outdoor track and field during the spring 2027 season. They therefore already have roster spots on BSU teams and will continue training and competing with those teams later this academic year regardless of the relief sought here. Permitting Robertson and Novak-Klotz to compete in cross country, and permitting Helms, Robertson, and Bushay to compete in indoor track and field will not displace another student-athlete or deprive anyone else of a roster spot. In addition, unlike many other athletes who have been granted temporary relief, Plaintiffs are not professional football or basketball players who left professional sports leagues to seek another year of collegiate eligibility.

10. Plaintiffs do not have any comparable alternative through which they can replace the competitive opportunities the NCAA's rule would deny them. Unlike sports such as football and basketball, which have established professional leagues and other avenues for elite athletes to compete outside collegiate athletics, there is no professional cross-country or track-and-field league in the United States that provides Plaintiffs a comparable opportunity to regularly compete at the highest levels of their sports. NCAA Division I competition is their only meaningful avenue to do so as they continue developing as athletes and prepare for the 2027 outdoor track-and-field

season. If Plaintiffs are barred from competing this fall and winter, those competitive opportunities will simply be lost.

## II. THE PARTIES

11. **Landon Helms** is a member of the BSU track-and-field team and an elite multi-event athlete who competes in the heptathlon and decathlon. An Idaho native, Helms graduated from Emmett High School in 2022 before beginning his collegiate career at Texas A&M, where he competed in indoor and outdoor track and field for two years. After the 2023–24 academic year, Helms decided to return home to Idaho and enrolled at BSU. He earned his bachelor's degree in project management from BSU in 2025 and is now pursuing a Master of Business Administration there.

12. Helms has flourished at BSU. In his first year as a Bronco, he swept the Mountain West multi-event titles, winning the heptathlon at the 2025 Mountain West Indoor Championships and the decathlon at the Mountain West Outdoor Championships. He then competed on the national stage, finishing ninth in the heptathlon at the NCAA Outdoor National Championships and earning Second Team All-American honors. Helms continued that success during the 2025–26 academic year, defending his Mountain West indoor heptathlon title and again earning Second Team All-American honors after finishing 15th in the heptathlon at the NCAA Indoor National Championships.

13. Despite that success, Helms deliberately sat out the 2026 outdoor season. He did so in reliance on his understanding that NCAA rules permitted him to compete in only four seasons of outdoor track and field and because he wanted to preserve his final season of eligibility to coincide with the completion of his master's degree. That decision came at a real cost. Helms gave up the opportunity to defend his Mountain West title, score points for BSU at the conference

championships, and qualify for and compete at the NCAA Championships. He also sacrificed substantial revenue opportunities. By sitting out the season, Helms lost opportunities to showcase his athletic abilities, create competition-related social-media content, attract sponsors, and earn sponsorship revenue.

14. Helms has now competed in four seasons of indoor track and field but only three seasons of outdoor track and field. He remains eligible to compete for BSU during the spring 2027 outdoor season and has been training and preparing to compete throughout the 2026–27 academic year. He is physically ready and able to compete. BSU wants him to compete as well: the University has informed Helms that, if permitted by the NCAA, he would be allowed to represent BSU during the upcoming indoor season. But the NCAA's current eligibility restrictions prohibit him from doing so.

15. For Helms, the consequences extend well beyond losing two seasons of collegiate competition. Helms intends to continue training and competing after graduation and hopes ultimately to compete at the U.S. Olympic Trials and qualify for the 2028 Olympic Games in Los Angeles. Competing during the 2026–27 indoor season would allow him to continue developing against elite competition, build his reputation and exposure, and pursue sponsorship opportunities that could help support a professional athletic career—and a family. Those opportunities cannot simply be recreated elsewhere: there is no professional track-and-field league in the United States or other competitive program available to Helms that provides opportunities comparable to NCAA Division I competition.

16. For Helms, losing the 2026–27 indoor season would impose significant athletic and financial harm. Helms intends to continue competing after graduation and hopes to compete at the U.S. Olympic Trials and qualify for the 2028 Olympic Games in Los Angeles. Continuing to

compete at the Division I level is critical to that goal: it provides elite competition and competitive experience that training alone cannot replicate, while allowing Helms to build the reputation and exposure necessary to attract sponsorships and support a professional athletic career. And there is no comparable substitute. There is no professional track-and-field league in the United States or other competitive program available to Helms that provides opportunities comparable to NCAA Division I competition.

17. Those lost opportunities have substantial economic value to Helms. Since approximately 2021, Helms has created social-media content that has generated tens of millions of views, and he has worked with or negotiated partnerships with numerous national brands. His value to sponsors is closely connected to his athletic career: training, travel, competitions, championships, rankings, records, and NCAA appearances generate content, expand his audience, and increase his value to potential sponsors. If the NCAA prevents Helms from competing, he will lose not only NIL royalties from BSU, but also opportunities for sponsored content, recurring brand partnerships, affiliate commissions, appearances, and other income tied to his athletic career and personal brand. These opportunities are far from hypothetical—Helms has already demonstrated his ability to attract an audience and obtain paid brand partnerships.

18. The NCAA's eligibility restrictions also disrupt plans Helms and his family made in reliance on his remaining eligibility. Helms and his wife deliberately planned their family, his education, and their future around his collegiate athletic timeline. Helms preserved his final outdoor season so that it would coincide with completion of his graduate degree, and his family structured major life decisions around that plan. The NCAA's restrictions now threaten to deprive Helms of the very competitive opportunities he deliberately sacrificed a season—and the athletic and financial opportunities that came with it—to preserve.

19. **Kaiya Robertson** is an elite middle- and long-distance runner who has competed for BSU since 2022. Robertson has achieved significant success at both the conference and national levels. In 2026, she won two Mountain West outdoor titles, placing first in both the 800 and 1500 meters, and qualified for the NCAA Outdoor National Championships in the 1500 meters. That same year, she earned Second Team All-American honors after finishing 14th in the mile at the NCAA Indoor National Championships and broke the all-conditions Canadian U23 record in the mile. Robertson has also twice qualified for the NCAA Cross Country National Championships and, in 2025, qualified for the NCAA Outdoor National Championships. She has excelled academically as well and was recently named the 2025–26 Mountain West Female Scholar-Athlete of the Year.

20. Robertson has competed in four seasons of cross country and indoor track and field, but only three seasons of outdoor track and field. She therefore remains eligible to compete for BSU during the 2027 outdoor season and is currently enrolled at BSU pursuing her MBA. Robertson has been training and preparing to compete throughout the 2026–27 academic year, is physically ready to compete, and would compete for BSU during the 2026 cross-country and 2026–27 indoor seasons if permitted by the NCAA. Yet because she graduated from high school in 2022, the NCAA's rule requires her to sit out those seasons before returning to compete for the same school during the outdoor season just months later.

21. The lost competition would have significant consequences for Robertson's athletic career. Robertson currently has a sponsorship agreement with HOKA and intends to pursue professional running after graduation, compete at the Canadian National Championships, and attempt to qualify for the 2028 Olympic Games in Los Angeles. Continued Division I competition gives her opportunities to improve against elite competition, gain exposure, build her reputation,

and attract the sponsorship support necessary to pursue those goals. There is no professional running league or other competitive program available to Robertson that could replace the Division I cross-country and indoor seasons she will lose absent an injunction.

22. **Jayda Bushay** is an accomplished sprinter who competes in the 200-meter, 400-meter, and 4x400-meter relay. Bushay graduated from high school in 2022 and began her collegiate career at the University of Cincinnati before transferring to the University of Nevada, Las Vegas ("UNLV"). In 2026, she earned All-Mountain West honors in both indoor and outdoor track and field. Bushay transferred to BSU at the end of the 2025–26 academic year, after earning her degree in applied health science from UNLV, and is now pursuing a certificate in physical activity and health.

23. Bushay has competed in four indoor seasons but only three outdoor seasons. She intends to compete for BSU during the 2027 outdoor season and has been training and preparing to compete throughout the 2026–27 academic year. She is physically ready and able to compete, and BSU would allow her to compete during the upcoming indoor season if permitted by the NCAA. But because Bushay graduated from high school in 2022, the NCAA's eligibility restriction requires her to sit out the indoor season—even though she will remain at BSU and compete for the same team during the outdoor season just months later.

24. That lost season would have lasting consequences. Bushay has previously earned NIL compensation and intends to pursue additional NIL opportunities, which depend on her visibility and success as an athlete. She also hopes to continue competing after graduation and explore opportunities to become a professional athlete while pursuing a career in physical therapy. Missing the indoor season would deprive Bushay of opportunities to compete against elite athletes,

improve her performance, gain exposure, and build her athletic reputation at a critical point in her career—opportunities that cannot be replicated through training alone.

25. **Nanette Novak-Klotz** is a Canadian-American middle- and long-distance runner whose path to becoming an elite Division I athlete was anything but conventional. Novak-Klotz graduated from high school in Vancouver, Canada, in 2022, after the COVID-19 pandemic significantly disrupted both her athletic development and the college recruiting process. Competitions in Canada were cancelled or limited, travel was restricted, and Novak-Klotz lost critical opportunities to race, gain exposure to college coaches, and find the collegiate program best suited to her development. She nevertheless earned an opportunity to compete at California State University, Fullerton, but her first two collegiate seasons were further disrupted by COVID-19 and injuries that limited her ability to compete consistently. By the fall of 2024, however, Novak-Klotz was beginning to demonstrate her potential: she was selected to represent British Columbia at the Canadian Cross-Country Championships, where her team won gold while competing against some of the best runners in Canada.

26. Convinced she was capable of more, Novak-Klotz entered the transfer portal and transferred to BSU in January 2025. There, her athletic trajectory changed dramatically. Under BSU's coaching, Novak-Klotz improved her personal best in the outdoor 1500 meters and began realizing the potential that years of disruption had blocked. Her breakthrough came during the 2025 cross-country season, when she earned a conference medal and finished fifth on BSU's team at the regional championships, helping the Broncos qualify for the NCAA Cross Country Championships. For Novak-Klotz, competing at Nationals confirmed what she had begun to discover at BSU: given the right coaching, teammates, and competitive environment, she could

compete successfully at the highest levels of collegiate running. After years of setbacks, Novak-Klotz was finally beginning to reach her potential.

27. Now, just as Novak-Klotz's years of work are translating into results, the NCAA's eligibility restrictions threaten to cut that progress short. Novak-Klotz is training, physically ready, and wants to compete for BSU during the 2026 cross-country season; BSU likewise wants her to compete if the NCAA permits her to do so. And Novak-Klotz believes she has only just begun to reach her potential as a distance runner, and she intends to continue competing at the national level for Canada in both cross country and outdoor track. Another season at BSU would allow her to continue developing against elite competition, increase her exposure, build her reputation, and pursue opportunities necessary to continue her athletic career after college.

28. **Defendant National Collegiate Athletic Association** ("NCAA") is a self-described unincorporated, not-for-profit, educational organization founded in 1906, and maintains its principal place of business in Indianapolis, Indiana. The NCAA is the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including several in Idaho. Among those members is BSU, which is located in Ada County, Idaho.

29. Through the NCAA's Constitution and Bylaws, *see* Ex. A (NCAA Division I Manual (2025-26)), the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, NCAA Bylaw 12.6 and the Redshirt Rule. The NCAA Constitution and Bylaws were adopted pursuant to a vote of the member institutions and various NCAA councils, and these rules can only be amended by a vote of the member institutions or NCAA councils.

30. As a practical matter, an academic institution that wishes to compete in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty," which includes the complete shutdown of a specific athletic program at a member institution for at least one year.

31. The NCAA and its member institutions control the highest and most popular level of collegiate education and athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for top tier education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must attend an NCAA Division I member institution.

32. There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletic services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that are best suited to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

## III. JURISDICTION AND VENUE

33. Subject matter jurisdiction is thus proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises, at least in part, under Section 1 of the Sherman Act, 15 U.S.C. § 1.

34. This Court can exercise jurisdiction over the NCAA as it conducts business within the state of Idaho. Defendant regulates several member institutions within the state of Idaho including regulating their athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities.

35. Venue is proper in the District of Idaho under 15 U.S.C. § 22 as the NCAA transacts business within the state of Idaho, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein are all situated in this judicial district.

36. This matter is properly brought in the Southern Division of the District of Idaho under Local Rule 3.1 as the Plaintiffs are all residents of Ada County and attend BSU, which is located in Ada County.

## IV. SUMMARY OF ARGUMENT

37. For almost fifty years, the NCAA has enforced a rule providing Division I college athletes with a five-year window to exhaust their competition eligibility. However, up through this year, the NCAA limited college athletes to *competing* in only four seasons of intercollegiate competition and otherwise dictated that a college athlete may use the fifth year only to compete in team activities without, or with limited, participation in intercollegiate competition (also known as "redshirting").

38. In the spring of 2026, the NCAA announced it would change its rules to allow all players to compete in all five seasons of eligibility without the need for a redshirt beginning in

August 2026. Specifically, the new rule will allow all athletes to fully compete for five years starting when they enroll in college. Rather than implement the rule for all athletes, the NCAA unfairly excluded all athletes who graduated from high school in 2022—even though they are still within five years of enrolling in college.[1]

39. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA Bylaws by reference. Under Idaho law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA promises all athletes the right to compete on a level playing field, but has tilted that playing field away from Plaintiffs and other 2022 high school graduates in both directions. At the start of their college careers, 2022 high school graduates were forced to compete against older, stronger, and more experienced athletes for roster spots and playing time because the NCAA gave all athletes enrolled in school during COVID a fifth season of competition. Then, at the end of their college careers, the NCAA made the fifth season of competition a permanent rule change—but excluded their class from the benefits of the change. As intended third-party beneficiaries of the NCAA's bylaws, Plaintiffs have standing to pursue a claim for violation of the covenant of good faith and fair dealing in connection with NCAA rule changes precluding them from receiving the benefits and fair competition they expected.

40. Plaintiffs do not challenge the concept of a defined eligibility period or the NCAA's Five-for-Five Rule itself. Rather, they challenge the NCAA's application of the rule that afforded the athletes Plaintiffs competed against in college (from the high school classes of 2017, 2018,

[1] The NCAA will still allow athletes who graduated from high school in 2022 to play in the 2026-27 academic year so long as they previously redshirted.

2019, 2020, 2023, 2024, and 2025) an additional year of competition while denying Plaintiffs the same opportunity.

41. The unfairness of this disparate treatment cannot be overstated. Division I athletics is extraordinarily competitive. Plaintiffs compete not only for podium finishes and championships, but also for the limited professional and sponsorship opportunities available after college. Competing at the Division I level provides the best—and, in many cases, the only—opportunity to develop their athletic abilities, gain national exposure, and demonstrate their potential to professional teams and sponsors. Yet the NCAA has given Plaintiffs' peers 25% more opportunities to compete at this level: 25% more opportunities to improve, 25% more opportunities to gain exposure, and 25% more opportunities to build their reputations and pursue professional careers.

42. The consequences are particularly stark with respect to financial opportunities. College athletes like Plaintiffs who first enrolled in 2022 only had an opportunity to receive one year of the $20.5 million in annual payments that Division I universities are now permitted to pay out to college athletes. This selective denial of benefits, when juxtaposed with the windfalls provided to earlier academic year classes, underscores the arbitrary and unfair nature of the NCAA's application of its Four Season Rule to Plaintiffs.

43. College athletics also offers a unique experience: the opportunity to train, strive, and compete at the highest level alongside fellow student-athletes while pursuing an education as part of a university community. Each Plaintiff chose to embrace that opportunity at BSU, proudly committing to representing themselves and the University in pursuing athletic excellence alongside their Bronco teammates. No professional league, private training program, or later athletic opportunity can recreate that environment—or restore a season of collegiate competition, once it has been lost. Preventing Plaintiffs from doing so deprives them not merely of laps around the

track, but of the opportunity to represent BSU, compete alongside their teammates, and participate fully in a formative experience available only at this exact moment of their lives.

## V. FACTUAL ALLEGATIONS

### A. An Overview of the NCAA

44. The NCAA is a member-led, nonprofit organization founded to "regulate the rules of college sport and protect young college athletes."[2] Article 1 of the NCAA Constitution states that the NCAA's basic purpose is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports. Ex. A (Constitution, Art. 1).

45. The NCAA claims it is "guided by its commitment to student-athlete well-being, fair and inclusive competition, and opportunities for academic and athletics success across all divisions,"[3] is "united around one goal: creating opportunities for college athletes," and "prioritiz[es] academics, well-being and fairness."[4] In practice, however, the NCAA has evolved into the central gatekeeper of a multibillion-dollar industry, where rules often serve to maximize institutional revenue rather than student-athlete welfare.

46. The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of college athletes, to

---

[2] *History*, NCAA, https://www.ncaa.org/about-us/history/.

[3] *NCAA MISSION AND PRIORITIES*, NCAA https://www.ncaa.org/about-us/mission-and-priorities/.

[4] *OPPORTUNITY*, NCAA http://fs.ncaa.org/Docs/public/opportunity/index.html.

sound academic standards and the academic success of college athletes, and to diversity, equity and inclusion." Ex. A (Constitution, Preamble).

47. Today, the NCAA and its members collaboratively establish rules governing numerous athletic competitions among member schools. Over 500,000 college athletes compete across NCAA's three divisions, representing approximately 1,100 member institutions. Roughly 350 schools compete at the Division I level, which is further divided into 32 conferences. While these conferences may adopt and enforce their own rules, such regulations must remain consistent with NCAA rules.

48. The NCAA Board of Governors, comprised of institution presidents, chancellors, ex-college athletes, and other chief executives, is the highest governing body and is responsible for enacting the rules governing participation in the NCAA.

49. The NCAA and its members abide by the NCAA manual, which is amended and promulgated annually and contains the NCAA's Constitution and Bylaws, which include nearly 500 pages of regulation governing all aspects of college sports. The NCAA's Constitution and Bylaws were adopted by a vote of the NCAA membership. These Bylaws are not merely technical guidance, but rather mechanisms by which the NCAA exerts control over college athletes' careers, compensation, and opportunities and the labor and consumer markets for college athletics.

**B. NCAA Eligibility Rule Change**

50. The NCAA's control over student-athletes is near-total. Through its Bylaws, the NCAA determines who may compete, how long they may compete, what compensation they may receive, and under what conditions their eligibility can be extended or revoked. For Division I athletes like Plaintiffs, an NCAA eligibility determination is not merely an administrative ruling – it is the gateway to potential earnings and to the athlete's professional future.

51. Under prior NCAA Bylaw 12.6, an NCAA Division I college athlete had five years of eligibility to play four seasons of intercollegiate competition in his or her chosen sport. Ex. A (Bylaws Art. 12.6). The NCAA's own Constitution expressly states the college athlete's window—known as an eligibility clock—starts to run from the date on which a college athlete registers as a full-time student at any collegiate institution.

52. As of June 22, 2026, the rule changed, with the NCAA granting athletes the ability to compete in all five seasons during their five years of eligibility that begins on the earlier of the date they enroll in college or the start of their first academic year after their 19th birthday.

53. The NCAA's discussions about the Five-for-Five Rule became public in September 2024.[5]

54. On October 25, 2025, the NCAA stated it would NOT adopt the Five-for-Five Rule "anytime soon" and eligibility rules would not change in either the current academic year or the 2026-27 academic year.[6]

55. The NCAA then reversed itself on April 15, 2026, and said it would likely be moving forward with the Five-for-Five Rule for the next academic year, with no indication it would exclude the high school class of 2022.[7]

---

[5] The NCAA begins discussions to give all student athletes the chance for a fifth year option, The Yellow Jacket (Sept. 10, 2024), https://theyellowjacket.org/the-ncaa-begins-discussions-to-give-all-student-athletes-the-chance-for-a-fifth-year-option/.

[6] NCAA will not implement '5-for-5' eligibility rules anytime soon, internal memo says, The New York Times (Oct. 22, 2025) https://www.nytimes.com/athletic/6741377/2025/10/22/ncaa-will-not-implement-5-for-5-eligibility-rules/.

[7] DI Cabinet adopts changes to eligibility rules for prospects, NCAA (April 15, 2026) https://www.ncaa.org/media-center-di-cabinet-adopts-changes-to-eligibility-rules-for-prospects/.

56. Then, on April 27, 2026, the Division I Board of Directors told the Division I Cabinet to move forward with the rule change, but exclude the high school class of 2022, with passage of the change expected in May.[8]

57. On May 22, 2026, the Division I Cabinet released an update documenting the planned exclusion of the high school class of 2022 and delaying passage of the rule change for an additional month.[9]

58. On June 22, 2026, the Division I Cabinet approved the rule change, with the exclusion of the high school class of 2022.[10]

59. On July 8, 2026, a class action complaint was filed in the United States District Court for the District of Colorado on behalf of a class of NCAA Division I athletes who had graduated from high school in 2022 and under the new Five-for-Five Rule were barred from competing during the 2026-27 school year. *Wisne v. NCAA*, 1:26-cv-3063 (D. Colo.). The *Wisne* plaintiffs sought a temporary restraining order and preliminary injunction and filed a motion to certify the class to permit all class members to compete during the 2026-27 academic year.

60. On July 31, 2026, in a lengthy opinion, the district court granted the plaintiffs' motion for a temporary restraining order and preliminary injunction. *Wisne v. NCAA*, 2026 WL 2214234, at *22 (D. Colo. July 31, 2026), *opinion clarified,* No. 1:26-CV-03063-CNS-KAS, 2026

---

[8] DI Board of Directors directs Cabinet to advance age-based eligibility rules, NCAA (April 27, 2026), https://www.ncaa.org/media-center-di-board-of-directors-directs-cabinet-to-advance-age-based-eligibility-rules/

[9] Division I Cabinet continues discussions of age-based collegiate eligibility model, NCAA (May 22, 2026) https://www.ncaa.org/media-center-division-i-cabinet-continues-discussions-of-age-based-collegiate-eligibility-model/

[10] Division I adopts age-based eligibility model, NCAA (June 23, 2026) https://www.ncaa.org/division-i-adopts-age-based-eligibility-model/

WL 2214320 (D. Colo. Aug. 2, 2026). After this injunction was entered, Plaintiffs believed they were eligible to participate in the 2026 cross country season and/or 2026-27 indoor track and field season.

61. The NCAA immediately appealed the decision and filed a motion to stay the district court's preliminary injunction pending appeal. In a two-to-one order, a three-judge panel granted the NCAA's motion to stay pending appeal without explanation. *Wisne v. NCAA*, No. 26-1309 (10th Cir. Aug. 21, 2026). After this stay was entered, Plaintiffs were told they were not eligible to participate in the 2026 cross country season and/or 2026-27 indoor track and field season.

**C. The Application of the Eligibility Restraints to Plaintiffs**

62. Cross country and track and field are somewhat unique among collegiate sports because athletes may compete in three distinct seasons during a single academic year: cross country in the fall, indoor track and field in the winter, and outdoor track and field in the spring. Each season provides only a limited number of opportunities to compete, yet each is treated separately for purposes of NCAA eligibility.

63. Plaintiffs all have one season of remaining eligibility for outdoor track and field under the old Four-in-Five Rule. In other words, each of the Plaintiffs began competing in the 2022-23 season and they each redshirted one season of outdoor track and field previously. All four Plaintiffs plan to compete in the upcoming outdoor track and field season.

64. Under the new Five-for-Five Rule, Plaintiffs would each also be able to compete in the 2026-27 cross country and/or indoor track and field seasons, but for the NCAA's arbitrary and unfair decision to exclude 2022 high school graduates from the benefits of the rule change.

65. All four Plaintiffs have been told they are not eligible to compete in the upcoming cross country (in the case of Robertson and Novak-Klotz) and indoor track and field (in the case of Helms, Robertson, and Bushay) seasons.

66. Because of the NCAA's arbitrary and unfair application of these rules, Plaintiffs' ability to compete and fully capitalize on NIL opportunities for next year have been and continue to be restricted. These rules have directly limited their athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm.

## VI. CLAIMS

### COUNT I

### BREACH OF THE CONTRACT WITH RESPECT TO THE NCAA BYLAWS

67. Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

68. The NCAA's Constitution and Bylaws, as set forth in the NCAA Division I Manual, constitute a binding contract among the NCAA and its member institutions, including BSU.

69. Plaintiffs are intended third-party beneficiaries of that contract. Specifically, the Constitution and Bylaws use mandatory language and identify student-athletes as the discrete and limited class they exist to benefit. Student-athletes—not the general public—are the group with the greatest interest in their enforcement.

70. The NCAA Constitution contains numerous provisions addressing student-athletes. The Preamble states that the Association is "committed to the well-being and development of student-athletes," that its "basic purpose" is "to support and promote healthy and safe intercollegiate athletics . . . and the student-athlete as an integral part of the student body," and a

belief "that intercollegiate athletics programs provide student athletes with the opportunity to participate in sports and compete as a vital co-curricular part of their educational experience."

71. The NCAA Manual is not merely a guideline – it is an enforceable contract, as the Manual explicitly states that "Division membership criteria constitute enforceable legislation" and that "each member institution shall comply with all applicable criteria of its division."

72. Student-athletes are central to the NCAA's framework. Without student-athletes, there is no NCAA and no college sports. The NCAA's eligibility and competition rules exist to govern student-athletes.

73. The NCAA agrees that it has a contractual obligation, as set forth in the NCAA Manual, to enact Bylaws that "shall be designed to promote the opportunity for institutions and eligible student-athletes to engage in fair competition," including in areas of "eligibility."

74. As intended third-party beneficiaries, the Plaintiffs are entitled to enforce the NCAA's obligations under the NCAA Constitution and Bylaws.

75. The NCAA breached both the express terms of the contract, as well as the implied covenant of good faith and fair dealing, by, among other things arbitrarily and capriciously excluding the high-school class of 2022 from the new Five-for-Five Rule while extending a fifth season of eligibility to every adjacent high-school class.

76. **The NCAA breached its own express textual commitments to fairness**. The NCAA's own Constitution—incorporated by reference into the membership agreement—contains express, operative commitments to fairness that are not aspirational but binding obligations on the Association. Article 1-C of the Constitution states that all individuals associated with intercollegiate athletics programs "should adhere to such fundamental values as respect, fairness, civility, honesty, responsibility, academic integrity, [and] ethical conduct." Ex. A (Constitution,

Art. 1-C). Article 1-D further requires that intercollegiate athletics programs be conducted "in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes," and expressly mandates that "coaches and administrators exhibit fairness, openness and honesty in their relationship with student-athletes." *Id.* (Constitution, Art. 1-D). The NCAA breached these textual commitments. Plaintiffs spent four years competing against athletes who received an extra year of competition through COVID-era waivers. The NCAA then made the fifth season of competition permanent—but carved out the class of 2022, a class bearing the full burden of those COVID-era waivers throughout their careers. That outcome is neither fair, nor open, nor honest. It is the precise antithesis of the fairness the NCAA's own governing document promises.

77. The NCAA also breached the covenant of good faith and fair dealing by denying Plaintiffs the financial benefits to which their eligibility status entitles them under the Manual. Bylaw 16.13.1.1, adopted effective July 1, 2025, expressly ties the right to receive direct institutional payments and benefits to a student-athlete's "period of eligibility to participate in intercollegiate athletics (see Bylaw 12.6)." Under the *House v. NCAA* settlement, Division I schools are now authorized to make direct cash payments of up to $20.5 million annually to their student-athletes. By arbitrarily truncating Plaintiffs' eligibility, the NCAA has not merely denied them competition time—it has denied them a concrete financial entitlement that the Manual itself conditions on active eligibility status.

78. As intended third-party beneficiaries of the NCAA's Bylaws and Constitution, Plaintiffs have standing to pursue a claim for violation of the covenant of good faith and fair dealing. The NCAA's own governing document—not merely general equitable principles—promised Plaintiffs fair treatment, authorized relief for their circumstances, and established a

proportional framework for evaluating their eligibility. The NCAA breached each of those commitments.

79. Plaintiffs have been injured by the NCAA's breach of contract, including by, but not limited to, being foreclosed from the opportunity to compete in a fifth season and from receiving the NIL money that such a season could bring.

80. **The NCAA further breached its own eligibility framework promise**. The NCAA represented to Plaintiffs—through its published Bylaws, its member institutions' coaches and compliance officers, and the NCAA Eligibility Center—that the eligibility rules applicable to them would be administered consistently and in accordance with the Manual's written framework. Specifically, Plaintiffs were told that their seasons of competition would be counted according to the established rules, that the Reinstatement Committee had discretion to grant relief for extenuating circumstances, and that the NCAA's eligibility system was designed to provide a fair and level playing field. Each Plaintiff enrolled in an NCAA institution, accepted scholarship obligations, complied with all NCAA rules, and structured their entire collegiate careers—including decisions about where to transfer, whether to seek professional opportunities, and how to preserve their academic eligibility—in reliance on those representations. The NCAA is now applying its eligibility rules in a manner that contradicts its own framework.

81. **The NCAA further breached its own level playing field promise**. The NCAA also represented to each Plaintiff, through its Constitution and the public statements of its officers, that the Association is "dedicated to the well-being and lifelong success of college athletes" and committed to providing student-athletes "the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience." Plaintiffs enrolled, competed, transferred when necessary, and exhausted four seasons of competition based on the reasonable expectation

that the NCAA would honor this commitment and not arbitrarily deny them the competitive opportunity available to every class before and after them. Instead, the NCAA has singled out the class of 2022—the one class still in school that bore the full burden of the COVID-era waivers without receiving their benefit—as the sole class of current athletes excluded from the permanent five-seasons rule.

82. Each of these promises was definite and specific. Each was made by the NCAA knowing that prospective student-athletes like Plaintiffs would rely on them in making irreversible decisions about their athletic and academic careers. Each induced substantial and detrimental action or forbearance: Plaintiffs enrolled in college rather than pursuing professional options, accepted scholarship terms rather than negotiating professional contracts, expended four years of athletic effort and academic progress, and forewent alternative career paths, all in reliance on the NCAA's representations about how their eligibility would be treated.

## COUNT II

### Promissory Estoppel

83. Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

84. The NCAA made definite and specific promises to Plaintiffs and other Division I student-athletes concerning the rules governing their eligibility and collegiate competition. Among other things, the NCAA promised that it would not adopt the Five-for-Five Rule, that its eligibility rules—including any amendments or changes to those rules—would be adopted and administered consistently and in accordance with the NCAA Manual, and that student-athletes would be afforded a fair and level playing field. These promises were particularly important because the

NCAA exercises control over whether, when, and for how many seasons student-athletes may compete in NCAA athletics.

85. Plaintiffs reasonably relied on these promises in making consequential and, in many instances, irreversible decisions about their collegiate athletic careers. Among other things, Plaintiffs relied on the NCAA's promises when deciding where and when to enroll in college, whether and when to compete, whether to use or preserve a season of eligibility by redshirting, whether and when to transfer, and whether to accept particular scholarship, NIL, and other financial opportunities. Plaintiffs also structured their academic, professional, financial, and family plans around the seasons of NCAA competition they reasonably understood would be available to them.

86. The NCAA knew or reasonably should have foreseen that student-athletes would rely on its promises and published eligibility rules in precisely these ways. The NCAA regulates the number of seasons in which student-athletes may compete, establishes the circumstances under which those seasons are used or preserved, and knows that eligibility is a finite and extraordinarily valuable resource for Division I athletes. The NCAA therefore knew or should have known that student-athletes would structure their athletic careers around its eligibility rules and would make decisions concerning competition, redshirting, transfers, scholarships, NIL opportunities, education, and future athletic careers in reliance on those rules and the NCAA's promises concerning their administration. It was likewise foreseeable that changing or selectively administering those rules after student-athletes had made such decisions would impose substantial and potentially irreparable economic harm on those athletes.

87. Plaintiffs have suffered and will continue to suffer substantial economic losses as a direct result of their reliance on the NCAA's promises. In reliance on those promises, Plaintiffs

made decisions that affected when they competed and when they preserved eligibility, and in doing so relinquished valuable opportunities that cannot now be recovered. Those losses include lost NIL and revenue-sharing payments, sponsorship and endorsement opportunities, scholarships and other financial benefits associated with collegiate competition, and the exposure and competitive opportunities necessary to develop Plaintiffs' athletic reputations and pursue professional and Olympic careers. For some Plaintiffs, their reliance also caused them to forgo opportunities to compete, generate sponsorship and NIL income, and increase their marketability during seasons they deliberately preserved for later use.

88. The NCAA cannot now undo the decisions Plaintiffs made in reliance on its promises or restore the seasons, competitive opportunities, and economic benefits Plaintiffs relinquished in reliance on them. Injustice can therefore be avoided only by enforcing the NCAA's promises and requiring it to administer its eligibility rules consistently, fairly, and equally as promised.

## COUNT III

### Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Idaho Competition Act, Idaho Code § 48-105

89. Plaintiffs repeat and reallege the allegations in the paragraphs above as if fully set forth herein.

90. Federal and Idaho state law prohibit contracts, combinations, and conspiracies that unreasonably restrain trade or commerce within interstate commerce.

91. Here, the anticompetitive effects of the NCAA's decision to foreclose certain student athletes—members of the high school class of 2022—from the modern intercollegiate athletics market far outweigh any procompetitive benefits. Eligibility is a prerequisite for athletes both receiving athletic scholarships and earning NIL and other compensation. Therefore, rules that

restrict who can play are inextricably tied to an athlete's academic and economic opportunities—both those attained merely by competing in college, such as NIL compensation, and those that accrue over a lifetime from earning degrees during a fifth year of competition. An athlete who is declared ineligible by the NCAA is categorically excluded from the modern intercollegiate athletic market and unable to receive those economic opportunities.

92. The NCAA's Five-for-Five Rule as applied to Plaintiffs is categorically an arbitrary, capricious, unreasonable restraint on trade. There is no meaningful difference between Plaintiffs and their peers who have been afforded five years of eligibility by the implementation of the Five-for-Five Rule. The NCAA indicates as much by allowing athletes to claim the eligibility afforded to them under the most favorable interpretation of either the old rules or the new rule—except for Plaintiffs.

93. As a result, the NCAA's Five-for-Five Rule in the nationwide market for competitive cross country and track and field athletes constitutes an unreasonable restraint on trade. Specifically, the rule produces anticompetitive effects, including but not limited to reduced labor supply, diminished quality of competition, exclusion of athletes due to numerous circumstances beyond their control, and foreclosure of a college athlete's academic, scholarship, revenue sharing, and NIL opportunities tied to eligibility.

94. Finally, less restrictive alternatives exist within the NCAA's own bylaws. The NCAA is already giving athletes who may have different eligibility formulations under the old and new rules the option to apply the rule that is most favorable to the athlete. The NCAA can do so here by granting the same fifth year of competition to Plaintiffs—who are already on campus and pursuing degrees, and who already have roster spots on BSU teams.

95. Plaintiff have been injured by the NCAA's anticompetitive conduct, including but not limited to by being foreclosed from the opportunity to play a fifth season and from the NIL money and development opportunities that such a season could bring.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court enter judgment in their favor, and against Defendants. Plaintiffs seek the following relief:

i) A temporary restraining order, preliminary injunction, and permanent injunction enjoining the NCAA from enforcing NCAA Bylaw 12.6 as to Plaintiffs to prevent them from competing in the 2026 cross country season and/or 2026-27 indoor track and field season;

ii) An order directing the NCAA to certify Plaintiffs are eligible to compete in the 2026 cross country season and/or 2026-27 indoor track and field season immediately or within such other reasonable time frame as this Court may set;

iii) An order enjoining the NCAA from enforcing the Rule of Restitution against Plaintiffs, their coaches, or BSU for permitting Plaintiffs to compete in the 2026 cross country season and/or 2026-27 indoor track and field season regardless of the outcome of this case;

iv) An order entering judgment against Defendant and in favor of Plaintiffs, holding Defendant liable for all claims alleged herein;

v) An order awarding Plaintiffs their attorneys' fees and costs as allowed by law; and

vi) An order awarding Plaintiffs such other relief as the Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs respectfully request that this matter be tried before a jury.

Dated: September 1, 2026

Respectfully submitted,

**STRIS & MAHER LLP**

*/s/ Colleen R. Smith*
Colleen R. Smith

*Attorney for Plaintiffs*