UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

LANDON HELMS, KAIYA ROBERTSON, JAYDA BUSHAY, and NANETTE NOVAK-KLOTZ,

Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

Case No. 1:26-cv-00568-DCN

**MEMORANDUM DECISION**

## I. INTRODUCTION

This case is yet another iteration (and the third the undersigned has presided over) of many similar cases nationwide that seek to enjoin Defendant National Collegiate Athletic Association (the "NCAA") from enforcing its eligibility limitation bylaws so student-athletes may participate additional years in NCAA Division I sports (the highest level of competitive collegiate sports) ("Division I").[1] Previously, under NCAA Bylaw 12.6, a student-athlete competing in Division I had five years to compete in four seasons of competition in any one sport. But in June 2026, the NCAA adopted new eligibility rules

[1] If there is one thing the undersigned has learned through presiding over these cases, it's that "the current system is a mess." *Lorient v. NCAA*, 2026 WL 2958759, at *1 (N.D.W. Va. Sept. 30, 2026). The Court echoes the words of Judge John Bailey of the United States District Court for the Northern District of West Virginia that "the present patchwork approach—where individual athletes seek emergency relief in courts across the country and different courts may reach different conclusions concerning substantially similar NCAA rules—does little to promote certainty, uniformity, or fairness." *Id.* These student-athletes have expended long hours and sacrificed much to perfect and perform their sport and deserve more than hanging their hopes upon the court in which their case happens to be filed. It is the undersigned's hope that Congress will shortly tame the wild west that is plaguing college sports.

allowing student-athletes to compete an additional year in Division I, for a maximum of five seasons of competition. These new rules, however, applied only to student-athletes who had not already exhausted their eligibility under the old rules at the end of the 2025–26 academic year.

Plaintiffs Landon Helms, Kaiya Robertson, Jayda Bushay, and Nanette Novak-Klotz ("Plaintiffs") are students at Boise State University ("BSU") and members of BSU's cross country and/or track and field teams. At the end of the 2025–26 academic year, each exhausted their eligibility to compete in at least one Division I sport under the old eligibility rules. Thus, according to the NCAA, the new rules allowing a fifth year of competition did not apply to them. Through their Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. 2, the "Motion"), Plaintiffs ask the Court to enjoin the NCAA from enforcing NCAA Bylaw 12.6 as to Plaintiffs so they may be eligible to compete in a fifth year of cross country and/or indoor track and field. Absent an injunction, Plaintiffs will lose out on valuable competitive experience and potential name, image, and likeness ("NIL") and sponsorship deals.

The Court previously denied Plaintiffs' request for a temporary restraining order ("TRO"), finding they were unlikely to succeed on their claims. *See generally* Dkt. 19. Regarding Plaintiffs' Sherman Act claim, the Court found Plaintiffs were unlikely to succeed because they failed to submit market evidence sufficient to enable this Court to define the relevant market and determine the anticompetitive effect of the NCAA's eligibility rules on that market. *Id.* The Court held in abeyance its decision on Plaintiffs' request for a preliminary injunction following further briefing and a hearing. *Id.*

While the Court was considering Plaintiffs' request for a preliminary injunction, Plaintiffs submitted a 50-page expert declaration concerning the relevant market and anticompetitive effects of the NCAA's eligibility rules on that market to bolster its Sherman Act claim. Dkt. 21-2. The NCAA submitted a competing expert declaration on October 22, 2026. Dkt. 28-1. Following an evidentiary hearing, the Court took the Motion under advisement. Dkt 37.

On October 29, 2026, the Court issued a condensed memorandum decision and order granting the Motion, finding Plaintiffs were likely to succeed on the merits of their breach of contract and Sherman Act claims. Dkt. 35. The Court now provides its full rationale for that decision.

## II. BACKGROUND

### A. Factual

#### *1. The NCAA and Bylaw 12.6*

The NCAA is an unincorporated, not-for-profit, educational organization located in Indianapolis, Indiana, that governs over 1,100 member institutions, with approximately 350 institutions in Division I. Through the NCAA's Division I Constitution and Bylaws (the "Bylaws"), the NCAA regulates intercollegiate sports among its Division I member institutions, including BSU. Failure of a member institution to comply with the Bylaws may result in various putative measures, such as fines, suspensions, vacating wins, or the shutdown of a specific athletic program for a period.

Through its Bylaws, the NCAA regulates the number of years a student-athlete is eligible to compete at a NCAA member institution. Prior to June 22, 2026, under Bylaw

12.6, a student-athlete competing in Division I had five calendar years to compete in four seasons of intercollegiate competition in any one sport (the "Four-in-Five Rule"). With few exceptions, the five-year period ran "from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." Dkt. 1-1, at 58.

On June 22, 2026, the NCAA adopted a new age-based eligibility rule, which replaced the Four-in-Five Rule and allowed student-athletes to compete in all five seasons during their five years of eligibility (the "Five-in-Five Rule"). At the time of the new rule's adoption, the NCAA announced that the Five-in-Five Rule would be forward-looking, meaning it applied to student-athletes initially enrolling in college in the fall of 2027 or later. For students initially enrolling in college in the fall 2026 and current student-athletes who had eligibility remaining at the end of the 2025–26 academic year, Division I member institutions may apply the Four-in-Five Rule *or* the new Five-in-Five Rule, whichever is most favorable to the student-athlete. For student-athletes who had already completed four seasons of competition under the Four-in-Five Rule, they were not entitled to take advantage of the new rule, even if they had a fifth year of eligibility remaining. The following chart produced by the NCAA[2] summarizes how Division I schools are to apply the new eligibility rule:

[2] Megan Durham Wright, *Division I adopts age-based eligibility model*, NCAA (June 23, 2026), https://www.ncaa.org/division-i-adopts-age-based-eligibility-model/.

| **Student-athletes** | **Which eligibility rules apply** |
|---|---|
| Student-athletes who used their final season of competition (under previous rules) during 2025–26. | No additional eligibility. |
| Current student-athletes with eligibility remaining (under previous rules) after the 2025–26 academic year. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university during 2026–27. | Either the previous rules OR the new age-based model, whichever is most beneficial to the student-athlete. |
| Prospects who initially enroll full time at any college or university in fall 2027 or later. | The age-based model only. |

Thus, student-athletes who graduated high school in 2022 and competed four straight seasons in college (like each of the Plaintiffs in this case) were not granted a fifth year of eligibility to compete under the new Five-in-Five Rule, even though the rule itself does not exclude them.[3]

*2. Plaintiffs' Eligibility*

Plaintiffs are student-athletes at BSU and members of BSU's cross country and/or track and field team. Each graduated high school in 2022, enrolled at a university that same year, and competed in four straight seasons of cross country and/or indoor track and field.[4] Because Plaintiffs exhausted their eligibility in these sports under the Four-in-Five Rule,

[3] For those student-athletes who graduated high school in 2022 and had not yet competed in four seasons, they retained their seasons of eligibility but would still be limited to four seasons of competition because the new Five-in-Five Rule has a hard-stop on eligibility after five consecutive years regardless of years of competition and would not be more beneficial to such athletes.

[4] Helms, Robertson, and Bushay have completed four seasons of indoor track and field, and Robertson and Novak-Klotz have completed four seasons of cross country.

the NCAA determined Plaintiffs were ineligible to compete in the 2026–27 cross country and/or indoor track and field seasons under the Five-in-Five Rule, though they retained their eligibility to compete in the upcoming outdoor track and field season, and Novak-Klotz retained her eligibility to compete in the upcoming indoor track and field season. Plaintiffs continue to work out with BSU's track and field team in preparation for the upcoming track and field season, and each has been informed that if permitted by the NCAA, BSU would allow Plaintiffs to represent BSU during the cross country and/or indoor track and field seasons.

Through their Motion, Plaintiffs are seeking to enjoin the NCAA from enforcing Bylaw 12.6 as to them so they may participate in a fifth year of competition in their respective sport(s): Helms, Robertson, and Bushay seek to compete in a fifth season of indoor track and field; and Robertson and Novak-Klotz seek to compete in a fifth season of cross country. Plaintiffs have benefitted and/or hope to benefit from NIL royalties and sponsorship agreements tied to their athletic careers and state that extending their athletic careers in Division I will allow them to "continue developing against elite competition, build his [or her] reputation and exposure, and pursue sponsorship opportunities that could help support a professional athletic career." Dkt. 1, at ¶ 15.

BSU's cross country season began on September 18, 2026, while its indoor track and field season begins in early December 2026. It does not appear that BSU submitted applications for eligibility waivers to the NCAA on any of the Plaintiffs' behalf. Without a waiver, Robertson and Novak-Klotz are ineligible to compete on BSU's cross country

team, and Helms, Robertson, and Bushay are ineligible to compete on BSU's indoor track and field team.

**B. Procedural**

On September 1, 2026, Plaintiffs filed their Complaint against the NCAA, alleging the NCAA's application of Bylaw 12.6 to Plaintiffs "unfairly limits the number of meets they can participate in during their five-year eligibility window and unjustifiably restrains their ability to earn money through use of their [NIL] connected to their work as Division I athletes." Dkt. 1, at 2. Specifically, Plaintiffs alleged: (1) the NCAA breached the express and implied terms of the NCAA Division I Constitution and Bylaws by unfairly excluding them from benefitting from an additional year of competition; (2) they reasonably relied on the NCAA's promises about its eligibility rules when making irreversible decisions about their collegiate athletic careers; and (3) the decision to exclude the high school class of 2022 from benefitting from the new Five-in-Five Rule is an uncompetitive restraint on the labor supply in violation of Section 1 of the Sherman Act and the Idaho Competition Act. *Id.* at 21–29.

Along with their Complaint, Plaintiffs filed the present Motion requesting injunctive relief against the NCAA so they may compete in BSU's 2026–27 cross country and indoor track and field seasons. Dkt. 2. The NCAA opposed the Motion. Dkt. 20.[5]

[5] On October 6, 2026, the NCAA filed a notice of supplemental authority (Dkt. 24), highlighting two recent state appellate court decisions reversing lower courts' injunctions against the NCAA in cases challenging the new Five-in-Five Rule. *See Borovicanin v. NCAA*, 2026 WL 2969538 (Ohio Ct. App. Oct 2, 2026); Dkt. 24-1 (Order, *NCAA v. Wells*, Case No. 2026-CA-1107-I (Ky. Ct. App. Oct. 2, 2026)).

The Court initially denied Plaintiffs' request for a TRO. Dkt. 19. The Court found those Plaintiffs seeking to compete in indoor track and field had not shown they were entitled to an emergency TRO because the indoor track and field season did not begin for another three months. *Id.* at 6. For those Plaintiffs seeking to compete in cross country, the Court found they were unlikely to succeed on the merits of their claims. *Id.* at 7–13. As to their breach of contract claims, the Court found the NCAA's general commitment to fairness was overridden by the specific terms of the Bylaws. *Id.* at 9. Concerning their Sherman Act claim, the Court found Plaintiffs were unlikely to succeed on that claim because they failed to submit market evidence sufficient to enable the Court to define the relevant market and determine the anticompetitive effect of the NCAA's eligibility rules on that market. *Id*. at 11–13. The Court held in abeyance its decision on Plaintiffs' request for a preliminary injunction following further briefing and a hearing. *Id.* at 15.

In their reply brief in support of their Motion (Dkt. 21), Plaintiffs attached an expert declaration by Mr. Ted Tatos, a quantitative microeconomist and statistician, to shore-up their Sherman Act claim. *See* Dkt. 21-2 (the "Tatos Declaration"). The Court granted the NCAA's request to file a sur-reply to respond to the Tatos Declaration (Dkt. 25), which the NCAA filed on October 22, 2026 (Dkt. 28). Attached to the NCAA's sur-reply was a rebuttal expert declaration by Dr. Matthew Backus, an economist with expertise in industrial organization and experience in antitrust matters. *See* Dkt. 28-1 (the "Backus Declaration").

The Court held a nine-hour evidentiary hearing on October 28, 2026,[6] which included the submission of two expert declarations; a declaration by Jennifer Henderson, the Managing Director of Division I Governance and Member Services; testimony by Patrick McCurry, the head coach of BSU's cross country and track and field teams; testimony by Plaintiffs Robertson, Novak-Klotz, and Bushay; and testimony by the parties' experts. Dkt. 37. During the hearing, it became clear Plaintiffs were advancing two primary theories of relief: breach of the express and implied terms of Bylaw 12.6,[7] and violation of the Sherman Act, 15 U.S.C. § 1. Following the hearing, the Court took the Motion under advisement. *Id.*

The next day, the Court issued a condensed order granting the Motion.[8] Dkt. 35. In the order, the Court stated Plaintiffs were likely to succeed on the merits of their updated breach of contract and Sherman Act claims. *Id.* at 2. This decision explains the Court's reasoning for granting the Motion.

---

[6] The day before the hearing, Plaintiffs submitted a notice of supplemental authorities, attaching five recent state-court decisions granting preliminary injunctions or TROs to student-athletes challenging the Five-in-Five Rule. Dkt. 34.

[7] Plaintiffs acknowledged at the hearing that Count I of the Complaint does not necessarily allege the NCAA breached the express terms of Bylaw 12.6. But their Complaint does raise the issue, *see* Dkt. 1, at ¶ 64, and the briefs and supplemental submissions clearly provided the NCAA notice of this claim. *See* Dkt. 20, at 16–17. The NCAA did not object to this theory in briefing or at oral argument, and Plaintiffs are still within their time to amend the complaint as a matter of course. *See* Fed. R. Civ. P. 15(a)(1)(B) and 15(b)(2) ("When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."). The Court will not deny Plaintiffs' Motion based on a curable technicality.

[8] As explained in the order, during the hearing, the Court learned that the PAC-12 Cross Country Championships were happening on October 30, 2026, and that Coach McCurry would race Plaintiffs Robertson and Novak-Klotz if the Court granted the Motion. As such, the Court agreed to issue a condensed ruling as quickly as possible because BSU's deadline for submitting the team roster for the Championships was the day after the hearing. *See* Dkt. 35, at 1–2.

## III. LEGAL STANDARD

"A preliminary injunction's purpose is to prevent irreparable harm that occurs before a court can render a decision on the merits." *Revelry Grp. LLC v. Jobe*, 2023 WL 3010224, at *3 (D. Idaho Apr. 18, 2023). "A preliminary injunction is an extraordinary equitable remedy that is never awarded as of right." *Garcia v. County of Alameda*, 150 F.4th 1224, 1229 (9th Cir. 2025) (citation modified). A party seeking a preliminary injunction must clearly demonstrate: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent injunctive relief; (3) that the balance of hardships tips in their favor; and (4) that an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Ninth Circuit applies the *Winter* factors on a sliding scale. "Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (emphasis in original). A party that cannot show a likelihood of success on the merits may nonetheless obtain injunctive relief "if there are serious questions going to the merits; there is a likelihood of irreparable injury to the plaintiff; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Serious questions are those "which cannot be resolved one way or the other at the hearing on the injunction." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 926 (9th Cir. 2003) (cleaned up).

A preliminary injunction and a TRO generally serve the same purpose of "preserv[ing] the status quo *ante litem* pending a determination of the action on the merits."

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980); *see also* Fed. R. Civ. P. 65. The status quo *ante litem* means "the last, uncontested status which preceded the pending controversy." *Regents of the Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 514 (9th Cir. 1984). Nevertheless, certain circumstances warrant divergence from the status quo.

There are two types of preliminary injunctions: mandatory and prohibitive. "A mandatory injunction orders a responsible party to take action, while [a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (citation modified). The difference is legally significant because mandatory injunctions are "particularly disfavored" and "are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir.2009). A court may not issue a mandatory preliminary injunction unless "the facts and law clearly favor the moving party." *Stanley*, 13 F.3d at 1320. "[T]he 'status quo' refers to the legally relevant relationship between the parties before the controversy arose." *Ariz. Dream Act*, 757 F.3d at 1061 (citation modified).

## IV. DISCUSSION

For the reasons set forth below, the Court finds Plaintiffs have met their burden for a preliminary injunction.

### A. Claim Splitting

Before discussing the *Winter* factors, the Court first addresses the NCAA's claim-splitting argument. The NCAA asserts the Court should deny Plaintiffs' Motion without reaching the merits, and dismiss their Complaint on res judicata grounds, "because Plaintiffs are asserting claims arising from the same nucleus of facts as *Wisne*." Dkt. 20, at 8.

*Wisne v. NCAA* is a case arising out of the United States District for the District of Colorado, wherein a group of twelve Division I student-athletes—who, like Plaintiffs, graduated high school and enrolled at NCAA member schools in 2022—filed a putative class-action lawsuit against the NCAA, seeking to compete a fifth season in collegiate sports under theories of breach of contract and violations of federal antitrust law. 2026 WL 2214234, at *1–3 (D. Colo. July 31, 2026). The district court there granted the plaintiffs' motion for preliminary injunction, *id.* at *22, and that same day certified the following class:

> All persons in the United States who began to play in collegiate sports in the 2022-2023 season, competed in NCAA Division I sports, and completed four years of eligibility as defined by the NCAA's prior rules by the conclusion of the 2025-2026 season, and are therefore barred from playing a fifth season due to the NCAA's adoption and immediate implementation of the Five-Year Eligibility Rule.

2026 WL 2211840, at *7. The preliminary injunction applied to the class, thus the NCAA was barred from applying Bylaw 12.6 to class members seeking to compete a fifth season in Division I. *Wisne v. NCAA*, 2026 WL 2214320, at *3 (D. Colo. Aug. 2, 2026). The NCAA appealed the injunction, and on August 21, 2026, the Tenth Circuit stayed the

injunction pending appeal, without providing an explanation for its decision other than saying the NCAA met its burden to justify issuing the stay. Order, *Wisne v. NCAA*, No. 26-1309 (10th Cir. Aug. 21, 2026).

On November 6, 2026, the Tenth Circuit issued a written decision explaining its reasoning for staying the lower-court's injunction. *See Wisne v. NCAA*, -- F.4th --, 2026 WL 3368646 (10th Cir. Nov. 6, 2026). First, the Tenth Circuit explained that plaintiffs in that case failed to define the relevant market as "all Division I athletics in the United States" because universities, not the NCAA, are the buyers of student-athlete labor services, and student-athletes do not see all Division I universities as "reasonably good substitutes" because not all Division I universities offer all Division I sports. *Id.* at *7. Second, the Tenth Circuit found plaintiffs failed to "allege any submarkets [of individual sports] in their complaint, nor did they assert their existence or define them when they moved for a preliminary injunction." *Id.* at *8. The Tenth Circuit held that although plaintiffs "have perhaps done more [to define the relevant market] than those plaintiffs in predecessor suits," the district court "clearly erred in defining the relevant market at all Division I athletics in the United States." *Id.* at *9. Had the Tenth Circuit not reversed the district court's injunction order, Plaintiffs would likely have been able to compete under that order had they joined the class. *See* Dkt. 1, at 19–20.

The rule against claim-splitting bars plaintiffs from "maintain[ing] two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *Mendoza v. Amalgamated Transit Union Int'l*, 30 F.4th 879, 886 (9th Cir. 2022) (citation modified). "[T]he bar of claim-splitting is applicable if the second suit

involves (1) the same causes of action as the first; and (2) the same parties or their privies." *Id.*

First, although Plaintiffs here seek similar injunctive relief as the plaintiffs in *Wisne*, the causes of action are not the same.[9] Any judgment entered in the present case would not impair the rights or interests of the parties in *Wisne* because no final judgment has been issued by the district court or the Tenth Circuit. Even if Plaintiffs had planned to take advantage of the injunction issued by the *Wisne* court, they did not "agree to be bound by the determination of issues" in that action. *See Taylor v. Sturgell*, 553 U.S. 880, 894 (2008). The evidence in the two cases is different as well—unlike the plaintiffs in *Wisne* who attempted to define the relevant market as "all Division I athletics in the United States," 2026 WL 3368646, at *9, Plaintiffs define and present evidence of the submarkets of cross country and track and field within Division I intercollegiate athletics. Also, Plaintiffs bring their breach of contract and promissory estoppel claims under Idaho state law, while the *Wisne* plaintiffs relied on their federal antitrust claim. *See Wisne*, 2026 WL 2214234, at *8.

Second, although Plaintiffs *could* be members of the *Wisne* class, there is no evidence that Plaintiffs joined the class and became certified members. What's more, there

[9] Whether two suits involve the same causes of action turns on:

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Mendoza*, 30 F.4th at 887.

has not been a judgment on the merits in *Wisne*, so any argument that *Wisne* has preclusive effect on Plaintiffs' claims is premature. *See Taylor*, 553 U.S. at 884. While there are surely similarities between the two cases, this is not the kind of circumstance the claim-splitting doctrine was meant to prohibit, and denial of the Motion on this ground is not warranted.

**B. Prohibitive vs. Mandatory**

The NCAA asserts Plaintiffs must meet the higher standard of review for mandatory injunctions because the requested relief requires the NCAA to "'recognize' additional eligibility for Plaintiffs that neither the old nor new eligibility rules permit," thus altering the status quo. Dkt. 20, at 13. Plaintiffs counter that the injunction is prohibitive because "the last uncontested status before this controversy arose was a uniform eligibility regime under which all Division I student-athletes were subject to the same rules and afforded the same number of seasons of competition." Dkt. 21, at 14. Plaintiffs further argue their requested relief "does not require the NCAA to take any affirmative action; rather, it would *prohibit* the NCAA from preventing Plaintiffs from competing and from punishing Plaintiffs, their coaches, or BSU under the Rule of Restitution." *Id.*

Recognizing that the Ninth Circuit has not provided clear guidance on the matter,[10] the Court tends to agree with Plaintiffs. The status quo between the parties prior to the NCAA's interpretation of the new Five-in-Five Rule was that all athletes were afforded the same number of years of competition. *Cf. Ariz. Dream Act*, 757 F.3d at 1061 (finding the status quo before defendants revised their policy to prohibit DACA recipients from

[10] *See Blythe v. NCAA*, 190 F.4th 857, 861 n.2 (9th Cir. 2026) (declining to reach this issue but noting that, under either standard, the outcome would be the same).

receiving driver's licenses was that all holders of federal employment authorization documents were eligible for driver's licenses). And the express language of the Five-in-Five Rule does not exclude Plaintiffs or similarly situated student-athletes. *See* Dkt. 20-2, at 56–57. It is only the NCAA's implementation of the Five-in-Five Rule that has changed the status quo. *Cf. Ariz. Dream Act*, 757 F.3d at 1061 ("By revising their policy in response to DACA, Defendants affirmatively changed this status quo."). Furthermore, the ultimate relief Plaintiffs request is to "enjoin [the NCAA] from enforcing NCAA Bylaw 12.6 . . . as to Plaintiffs." Dkt. 2-6, at 2. Although Plaintiffs also request an order directing the NCAA "to recognize [Plaintiffs] are eligible to compete in [their relative sport] season," *id.*, there is no clear action such a directive would require the NCAA to take. Lastly, as discussed further below, compensatory damages would be an insufficient remedy due to the lost opportunity to compete. *See Ohio v. NCAA*, 706 F. Supp. 3d 583, 597 (N.D.W. Va. 2023) (collecting cases); *Pavia v. NCAA*, 760 F. Supp. 3d 527, 544 (M.D. Tenn. 2024).

Nevertheless, the Court need not decide the issue because it finds that "[u]nder the typical standard of review applied to prohibitive injunctions or the heightened standard of review applied to mandatory injunctions, . . . the outcome of this case is the same." *Blythe*, 190 F.4th at 861 n.2.

**C. Likelihood of Success**

"Likelihood of success on the merits 'is the most important'" factor in determining whether a preliminary injunction should issue. *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). This standard "does not require a plaintiff to show that it is more likely than not that it will win on the merits" but rather that "there is a substantial

case for relief on the merits." *Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1218 (D. Idaho 2018).

In their Complaint, Plaintiffs alleged three claims for relief against the NCAA: (i) breach of contract with respect to the NCAA's Division I Manual; (ii) promissory estoppel; and (iii) restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1. During briefing and at oral argument, Plaintiffs made clear they were focusing their claims on two principal theories of relief: (1) breach of the express and implied terms of Bylaw 12.6, and (2) their Sherman Act claim. The Court will discuss the likelihood of success of these two claims in turn.

*1. Breach of Contract*[11]

"The elements for a claim for breach of contract are: (a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Edged In Stone, Inc. v. Nw. Power Sys., LLC*, 321 P.3d 726, 730 (Idaho 2014) (quoting *Mosell Equities, LLC v. Berryhill & Co., Inc.*, 297 P.3d 232, 241 (Idaho 2013)).

*i. Existence of a Contract*

The Division I Manual sets forth the NCAA's Bylaws. Dkt. 2-1, at 16. The NCAA (briefly) disputes the Division I Manual is a contract, suggesting instead that it is "a suite of regulatory provisions that the NCAA member institutions have adopted through a democratic, legislative process" that provides "a comprehensive governance framework

[11] Title 28 U.S.C. § 1367 provides that a district court may exercise supplemental jurisdiction over state claims when they are "so related" to the federal claims "that they form part of the same case or controversy under Article III of the United States Constitution."

for the conduct of intercollegiate athletics among member institutions." Dkt. 20, at 14. The NCAA cites no authority supporting its position and does not address Plaintiffs' slew of caselaw holding the opposite. *See* Dkt. 2-1, at 13–14 (citing cases).

Generously, the NCAA's argument is made half-heartedly and lacks coherent rationale. The Bylaws contained within the Division I Manual are not simply a "framework" of guidelines; they are binding, enforceable rules and regulations, the violation of which can result in various fines or sanctions for member institutions. *See Kemmer v. Newman*, 387 P.3d 131, 134 (Idaho 2016) ("The bylaws of a corporation are equivalent to contracts among the members of the association and are binding on its members." (citation modified)); *NCAA v. Miller*, 795 F. Supp. 1476, 1486 (D. Nev. 1992) ("Every NCAA member has voluntarily and contractually agreed to abide by these rules and regulations," including the NCAA Constitution), *aff'd*, 10 F.3d 633 (9th Cir. 1993). That they were adopted "through a democratic, legislative process" does not make them any less binding on member institutions. Dkt. 20, at 11. Thus, the Division I Manual, including its Constitution and Bylaws, constitutes a valid, enforceable contract among the NCAA and its member institutions (including BSU).

*ii. Plaintiffs' Third-Party Beneficiary Status*

Plaintiffs argue they are third-party beneficiaries of the Division I Manual with rights to enforce its provisions. Dkt. 2-1, at 14. "A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Idaho Code § 29-102. "The third party must show that the contract was made primarily for his benefit, and that it is not sufficient that he be a mere incidental beneficiary." *Idaho*

*Power Co. v. Hulet*, 90 P.3d 335, 337 (Idaho 2004).

Many courts have found that student-athletes are third-party beneficiaries with rights to enforce the Division I Manual. *See, e.g.*, *Battle v. NCAA*, 2024 WL 4685604, at *4 (N.D.W. Va. May 28, 2024) (finding it "quite clear that student-athletes are the beneficiaries" of the NCAA's Constitution and Bylaws); *Bloom v. NCAA*, 93 P.3d 621, 623–24 (Colo. App. 2004) ("[T]he NCAA's constitution, bylaws, and regulations evidence a clear intent to benefit student athletes."). Others have found the opposite. *See, e.g.*, *Doe 1 v. NCAA*, 2024 WL 3293591, at *20 (S.D. Ind. July 2, 2024) (finding it is "plausible to infer [the Manual provisions] are intended in some way to benefit NCAA student athletes" but that such benefit is incidental and "not sufficient to confer third party beneficiary status under Indiana law").

This Court agrees with the former, as it "is quite clear that student-athletes are the intended beneficiaries of the NCAA's agreements." *See Battle*, 2024 WL 4685604, at *4. The NCAA Division I Manual sets forth the NCAA's Constitution and Bylaws and requires the Bylaws "to promote the opportunity for institutions and eligible student-athletes to engage in fair competition." Dkt. 20-2, at 360. The Constitution's Preamble also sets forth many principles geared toward the goal of promoting healthy and safe intercollegiate athletic experiences as part of student-athletes' educational and collegiate experience. *Id.* at 13. In short, the NCAA and its member-institutions have agreed and intend to provide intercollegiate athletic experiences primarily for the express benefit of student-athletes.[12]

[12] The NCAA's citation to *Hairston v. Pacific 10 Conference*, 101 F.3d 1315 (9th Cir. 1996), is not controlling here. There, the Ninth Circuit, applying Washington law, agreed with the district court that

As discussed more fully below, the new Five-in-Five Rule contains no exclusion or carve-out for the class of 2022, and as written grants Plaintiffs a contractual right to compete a fifth year in their respective sports. Thus, Plaintiffs are third-party beneficiaries to the 2026–27 NCAA Division I Manual and have standing to enforce its provisions.

*iii. Breach of Bylaw 12.6*

Plaintiffs allege the NCAA breached the express terms of Bylaw 12.6 "by arbitrarily and capriciously excluding the high-school class of 2022 from the new Five-in-Five Rule while extending a fifth season of eligibility to every adjacent high-school class." Dkt. 1, at 22. Plaintiffs request the Court simply "enforce the new Rule as written." Dkt. 21, at 14. Plaintiffs also allege the NCAA breached the implied covenant of good faith and fair dealing by denying Plaintiffs the ability to revenue share with BSU, which is a benefit under the Bylaws directly tied to their eligibility status. Dkt. 2-1, at 16–17.

The Court finds Plaintiffs are likely to succeed on their breach of contract claims. The new Bylaw 12.6 reads as follows:

> **12.6 Five-Year Period of Eligibility.** An individual's period of eligibility for practice and competition shall be limited to five years. An individual's five-year period of eligibility begins with the earlier of the following:
>
> (a) The regular academic term (semester or quarter) of an academic year in which the individual enrolls in a collegiate institution (domestic or foreign; see Bylaw 14.02.4) in a minimum full-time program of studies and attends a class in that term while enrolled full time; or

---

"vague, hortatory pronouncements" in the NCAA Constitution "are not sufficient to support the players claims that the Pac–10 intended to assume a direct contractual obligation to every football player on a Pac–10 team." *Id.* at 1320. Under Washington law, to enforce third-party beneficiary rights, the parties to the contract must have intended "that the promisor assume a direct obligation to the intended beneficiary at the time they enter into the contract." *Id.* Idaho's law is not so narrow and requires only that the contract "express an intent to benefit the third party." *Adkinson Corp. v. Am. Bldg. Co.*, 690 P.2d 341, 344 (Idaho 1984).

> (b) The beginning of the regular academic year immediately after the individual's 19th birthday.

Dkt. 20-2, at 56–57.

Plaintiffs argue that because they began their collegiate careers in the fall of 2022, under the new Bylaw 12.6 they still have a fifth year of eligibility to compete in cross country and/or indoor track and field, and nothing in the express language of Bylaw 12.6 excludes them from benefitting from a fifth year of competition in their respective sports. The NCAA counters that the 2026–27 version of the Division I Manual, "read in context, is not intended to benefit former student-athletes who, like Plaintiffs, have exhausted their eligibility under the NCAA rules in effect during their eligibility period." Dkt. 20, at 16. The NCAA points to statements made by the NCAA around the time the new Five-in-Five Rule was adopted, as well as the "actual legislation the NCAA's membership voted on," to show that "the NCAA's intent to exclude Plaintiffs from the new eligibility model is clear and obvious." *Id.* at 17.

Even if the NCAA was clear in its intent to exclude Plaintiffs and others in their situation from benefitting from the new Five-in-Five Rule, the rule that was ultimately adopted does no such thing. As written, Bylaw 12.6 states that all student-athletes have five years to compete in Division I sports, beginning either at the time they first enroll at a collegiate institution or the academic year following their 19th birthday. Dkt. 20-2, at 56–57. Nothing in Bylaw 12.6, or anywhere else in the Bylaws for that matter, indicates the new rule applies only to student-athletes who have eligibility remaining under the old Four-in-Five Rule. Although the NCAA is responsible for interpreting the Bylaws, *see* Dkt. 20-

2, at 31, this is not an issue of interpretation. The Court finds no ambiguity in the Bylaws and, therefore, does not need to look outside its four corners to ascertain its meaning. *See TCR, LLC v. Teton County*, 559 P.3d 302, 323 (Idaho 2024). The NCAA cannot create ambiguity simply by disputing the intent of Bylaw 12.6. *See J.R. Simplot Co. v. Nestle USA, Inc.*, 2009 WL 564194, at *5 (D. Idaho Mar. 4, 2009) ("[A] contract is not rendered ambiguous simply because the parties disagree as to the meaning of its terms.") (citing Delaware contract law). Because the meaning of Bylaw 12.6 is clear, the NCAA's decision to exclude Plaintiffs and other similarly situated student-athletes from a fifth season of competition contradicts the Bylaw's plain meaning. Thus, the Court finds the NCAA likely breached the express terms of Bylaw 12.6 when it excluded Plaintiffs from competing in cross country and/or track and field during the 2026–27 academic year.

Turning to the implied covenant claim, the NCAA argues this claim is foreclosed by the express terms of the Division I Manual because Plaintiffs are no longer eligible to compete in cross country and/or indoor track and field. Dkt. 20, at 17. Because the NCAA likely breached the express terms of Bylaw 12.6, it also likely breached the implied covenant.

Under Idaho law, every contract contains an implied covenant of good faith and fair dealing. *Drug Testing Compliance Grp., LLC v. DOT Compliance Serv.*, 383 P.3d 1263, 1272 (Idaho 2016). The covenant "requires the parties to perform, in good faith, the obligations required by their agreement." *Id.* (quoting *Silicon Int'l Ore, LLC v. Monsanto Co.*, 314 P.3d 593, 607 (Idaho 2013)). "A violation of the covenant occurs when either party violates, nullifies or significantly impairs any benefit of the contract." *Id.* (citing

*Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 864 (Idaho 1991)). "The implied covenant of good faith and fair dealing does not create independent obligations, it merely applies to contractual obligations." *Id.* (citing *Silicon Int'l Ore*, 314 P.3d at 607).

The Bylaws provide that member institutions cannot enter into licensing, promotional, or endorsement agreements with a student-athlete beyond that student-athlete's eligibility to compete. *See* Dkt. 20-2, at 188. As discussed above, Bylaw 12.6 does not exclude Plaintiffs from competing a fifth year in cross country and/or track and field. By excluding Plaintiffs from their contractual right to compete, the NCAA has also impaired their ability to benefit from revenue sharing with BSU. Thus, the Court finds the NCAA likely breached the implied covenant of good faith and fair dealing.

*iv. Damages*

As this Court has already recognized, and as discussed further below in *infra* Section IV(D)(1), Plaintiffs "are likely to suffer harm if they are unable to compete." Dkt. 19, at 14; *see also Ohio*, 706 F. Supp. 3d at 597 (listing cases where courts held lost opportunity to participate in collegiate sports is irreparable harm). Having clearly established each element showing the NCAA breached the express and implied terms of the Bylaws, it is likely Plaintiffs will succeed on their breach of contract claims.

*2. The Sherman Act Claim*

Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "unreasonable restraints on trade." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984). The Sherman Act only applies to rules that are "commercial in nature." *Worldwide Baseball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 958 (6th Cir. 2004). To succeed on a Sherman Act

claim, a plaintiff must establish the NCAA has "unreasonably restrained trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003).

The NCAA's restraints on trade are reviewed under the rule of reason analysis framework. *NCAA v. Alston*, 594 U.S. 69, 96–97 (2021); *Blythe*, 190 F.4th at 863. The rule of reason analysis is "a three-step, burden-shifting framework for distinguishing between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Blythe*, 190 F.4th at 863. (citation modified). Under this framework, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018). "Should the plaintiff carry that burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Alston*, 594 U.S. at 96–97 (citation modified) (quoting *Am. Express Co.*, 585 U.S. at 541–42).

The Court denied Plaintiffs' request for a TRO based, in part, on their failure to submit any evidence that would allow the Court to define the relevant market or determine whether the NCAA's eligibility bylaws have a substantial anticompetitive effect, as required under *Blythe*. *See* Dkt. 19, at 11–13. *Blythe* was issued eight days after Plaintiffs filed their Complaint and the present Motion, and without any evidence to support Plaintiffs' Sherman Act claim, the Court had no choice but to deny Plaintiffs' request for

a TRO based on that claim. *Id.* at 13.

To remedy their lack of market evidence at this stage, Plaintiffs submitted the Tatos Declaration with their reply brief in support of the Motion.[13] Dkt. 21-2. Mr. Tatos has approximately thirty years of experience in economic, statistical, and econometric analysis, and has extensively researched and published concerning the intersection of antitrust and labor economics in the context of intercollegiate athletics. *Id.* at 4–5. According to Plaintiffs, Mr. Tatos's Declaration and testimony "supplies precisely what the Ninth Circuit found missing in *Blythe*: a record permitting the Court to define the relevant market based on the 'market realities' of the sports at issue and to assess the challenged restraint's effects on competition in those markets." *Id.* at 8–9.[14]

In their sur-reply, the NCAA submitted the Backus Declaration to rebut the Tatos Declaration and argued that the Tatos Declaration does not satisfy the errors the Ninth Circuit identified in *Blythe*. Dkt. 28, at 2. The NCAA asserts that "Mr. Tatos's opinions still fall far short of providing evidence in support of" Plaintiffs' market definition, and

[13] When considering a motion that relies on facts outside the record, the Court may allow parties to submit affidavits and present testimony orally or on deposition. Fed. R. Civ. P. 43(c). Because *Blythe* changed the standard under which the Court may grant a preliminary injunction on a Sherman Act claim, the Court did not strike the Tatos Declaration but allowed the NCAA to file a sur-reply to respond to the Tatos Declaration. *See* Dkt. 25; *Inland Empire Waterkeeper v. Corona Clay Co.*, 189 F.4th 804 (9th Cir. 2026) (holding where an intervening change "broaden[s] the scope of factual findings relevant to" an issue, the parties must have an opportunity to develop the factual record).

[14] Two other federal courts have recently considered declarations submitted by Mr. Tatos on behalf of student-athletes seeking to compete another year in Division I under the Five-in-Five Rule. *See Lorient*, 2026 WL 2958759; *Simpson v. NCAA*, 2026 WL 3168087 (D.R.I. Oct. 22, 2026). As far as the undersigned can tell, the declarations submitted in those cases are substantively similar to the Tatos Declaration here. Unsurprisingly, as is the case with many of these challenges to the NCAA's eligibility rules, the judges in those cases reached opposite conclusions. *Contrast Lorient*, 2026 WL 2958759, at *15–22, *with Simpson*, 2026 WL 3168087, at *6–8. Alas, the wild-west saga that is college sports litigation rides on.

that Mr. Tatos fails to proffer evidence beyond Plaintiffs' own exclusion showing NCAA Bylaw 12.6 has an anticompetitive effect. *Id.* at 5, 8–11.

The Court has closely reviewed the Tatos Declaration and Backus Declaration and considered the testimony both sides presented at the hearing. For the following reasons, the Court finds Plaintiffs have provided evidence sufficient to define the relevant market and show anticompetitive effect. Because the NCAA elected to not provide a procompetitive rationale for the Five-in-Five Rule, Plaintiffs are likely to succeed on their Sherman Act claim.

*i. Commercial Restraint*

Section 1 of the Sherman Act outlaws contracts "in restraint of trade or commerce." 15 U.S.C. § 1. Post *Blythe*, the Ninth Circuit treats NCAA Bylaw 12.6 as a commercial restraint subject to the Sherman Act. *See Blythe*, 190 F.4th at 863. This is consistent with what all other circuit courts that have considered the issue have decided. *See NCAA v. Alston*, 594 U.S. 69, 94 (2021) (finding the NCAA is a "commercial enterprise" subject to the Sherman Act); *Robinson v. NCAA*, 172 F.4th 271, 289 (4th Cir. 2026) (joining other appellate courts in concluding post-*Alston* that the NCAA's eligibility rules are subject to the Sherman Act) (citing *Elad v. NCAA*, 160 F.4th 407, 414-15 (3rd Cir. 2025); *Fourqurean v. NCAA*, 143 F.4th 859, 863 (7th Cir. 2025)). The NCAA does not challenge this finding, and no further analysis is necessary.

Having established Bylaw 12.6 is commercial in nature, the Court turns to "whether that restraint is an unreasonable restraint on trade." *Elad*, 160 F.4th at 415.

*ii. Defining the Relevant Market*

Before applying the rule of reason analysis, the Court must define the relevant market. *Blythe*, 190 F.4th at 863–64; *Fourqurean v. NCAA*, 143 F.4th 859, 869 (7th Cir. 2025) (stating that determining the relevant market and defendant's market share are "threshold issues"). Failing to define the relevant market is grounds for denying a request for injunction. *See Elad*, 160 F.4th at 416 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market.").

Plaintiffs bear the burden of providing sufficient evidence for the Court to define the relevant market. *Johnson v. NCAA*, 2025 WL 1790345, at *10 (D. Mont. June 26, 2025). As stated in *Blythe*, the outer boundaries of the labor market for student-athletes "is comprised of those employers seen by workers as reasonably good substitutes." 190 F.4th at 864. Defining the relevant market requires more than a "cursory analysis of the relevant market" but a "fact-specific assessment of market power and market structures to assess the restraint's actual effect on competition." *Id.* (citation modified). A plaintiff must present "concrete evidence" that addresses "market dynamics, the relevant market participants, [and] whether any market participants are employers seen as reasonably good substitutes." *Id.* at 865–66.

Under *Blythe*, the Court finds the Tatos Declaration and testimony presented at the hearing supply the necessary evidence to perform a "fact-specific assessment" to define the relevant market. 190 F.4th at 864. Plaintiffs define the market as "NCAA Division I intercollegiate athletics, wherein each athlete participates in his or her sport-specific market

(i.e., sub-market)."[15] Dkt. 21-2, at 9. Unlike the plaintiff in *Blythe* that relied on *Alston*, other district court orders, and arguments in a motion to define the relevant market, Plaintiffs rely on the Tatos Declaration, which was made specifically for this case, and testimony given at the hearing by Mr. Tatos, Coach McCurry, and Plaintiffs to support their proffered definition.

First, the Court finds the Tatos Declaration provides direct evidence of the NCAA's monopsony power over Division I cross country and track and field teams. "Generally, the first question an antitrust case challenging certain anticompetitive conduct asks whether the defendant has sufficient market power to enable it to harm competition." Dkt. 21-2, at 8. Market power is "the ability to profitably impose a restraint on competition," and whether "substitution to other alternatives discipline any attempt to do so." *Id.* at 10. In the input-market context, market power "consists of proof that a defendant buyer reduced compensation to sellers below competitive levels or excluded competition." *Id.* Direct evidence of market power "can demonstrate the existence of a relevant market in which that power exists." *Id.* (citing U.S. Dep't of Justice & Fed. Trade Comm'n, *Merger Guidelines*, § 4.3 at 41).

[15] The NCAA argues this market definition is "incompatible" with Plaintiffs' Complaint, thus "failing to heed *Blythe*'s instructions to ensure 'a well-defined relevant market' out of the gate." Dkt. 28, at 3. In the Complaint, Plaintiffs defined the relevant market as being "the modern intercollegiate athletic market" and "the nationwide market for competitive cross country and track and field athletes." Dkt. 1, at 28. While the Court understands the definition in the Complaint differs from that in the Tatos Declaration, it does not think the distinctions are as drastic as the NCAA would like them to be. For starters, each contemplates the relevant market as being "nationwide," since "[a]ll NCAA Division I institutions are located in the United States." Dkt. 21-2, at 9 n.11. Each definition also encompasses only "intercollegiate" athletics and not professional or other athletic leagues. Dkt. 1, at 28. And finally, each narrows the market to include only those institutions participating in "competitive cross country and track and field." *Id.*

Mr. Tatos begins by pointing to scholarship and past caselaw that have found—and the NCAA has readily admitted—"[t]he NCAA and its members constitute horizontal wage-fixing cartel that holds monopsony power over college athletics to participate under the NCAA framework." *Id.* at 11. As evidence the NCAA continues to operate as a cartel with monopsony power today, Mr. Tatos highlights three restrictions the NCAA currently enforces on Division I members:

i. A requirement that all NIL deals above $600 must be subject to scrutiny by the College Sports Commission (CSC).

ii. A cap on revenue-sharing, i.e., a cap on direct compensation that each NCAA Division I school can pay to its athletes. This cap equals 22 percent of the average size of the "revenue pool" among Power Four conference members. The settlement also constrains the sources of revenue considered as part of the revenue pool.

iii. Hard roster caps limiting the number of athletes.

*Id.* at 14. Mr. Tatos provides evidence that just prior to the imposition of CSC review of NIL deals in June 2025, NIL payments increased by 824 percent over the same month the previous year. *Id.* at 14–16. He also provides data that average deal size the CSC rejects is "nearly five times larger" than the average cleared deal size, indicating that the CSC review reduces compensation for student-athletes. *Id.* at 16–18. He further provides evidence that nearly all Power Four conference schools in Division I "either met the [revenue-sharing] cap or came within 5 percent of reaching it," and Division I cross country and track and field team rosters are capped at 17 and 45 individuals, respectively, for both men's and women's teams. *Id.* at 18–19. All these actions, Mr. Tatos opines, are consistent with current market realities illustrating the NCAA's monopsony power, as the NCAA is

currently seeking exemptions from federal antitrust laws through the proposed Protect College Sports Act, and two of the largest Power Four conferences requested additional revenue-sharing funds beyond what the NCAA currently allows. *Id.* at 20–22. The NCAA's ability to impose these commercial restraints unilaterally is direct evidence of its market power over Division I member institutions and over Plaintiffs' cross country and track and field submarkets. *Id.* at 21–22.

Next, Mr. Tatos discusses indirect evidence of the NCAA's monopsony power (though he believes the direct evidence he submitted is sufficient to define the relevant market). *Id.* at 23. First, he provides evidence that teams within college divisions outside Division I are not viable substitutes. *Id.* at 24–27. With respect to track and field (no extra-collegiate cross country league exists), Mr. Tatos provides evidence that the vast majority of Olympic track and field athletes in the 2024 Paris Olympics came from Division I schools. *Id.* at 24–25. Next, Mr. Tatos provides evidence that professional opportunities for NCAA track and field athletes (i.e., sponsorships and clubs) are limited to fewer than one percent of those athletes, and many supplement the income from their sport with other employment. *Id.* at 27–28. He also provides examples that other professional organizations such as the NBA or NFL fail to exert any discipline over the NCAA's monopsony power because "Division I athletes cannot simply move to professional leagues," only a small fraction ever go on to participate in professional sports, and many that choose to go on to professional sports are not selected by those teams. *Id.* at 29–31. Thus, Mr. Tatos concludes, the NCAA unilaterally and profitably imposes restrictions on student-athlete

compensation, and student-athletes are unable to depart Division I for other sports leagues in sufficient numbers to discipline the NCAA's restraints. *Id.* at 31.

At the evidentiary hearing, Mr. Tatos defended his position that because no other organizations are able to disrupt the NCAA's ability to reduce compensation and exclude labor competition, especially in the cross country and track and field submarkets, the NCAA's clear exercise of monopsony power over Division I cross country and track and field demonstrates the existence of a relevant market in which that power exists. *See* Dkt. 40, at 156–57 ("The relevant market is where workers would go in response to a restraint. . . . In other words, if the NCAA imposes a cap, imposes some restraint, where would athletes go to escape that restraint?"). In addition, Coach McCurry and Plaintiffs each testified there is no comparable alternative to competing in NCAA Division I cross country and/or track and field. They each testified that Division II, Division III, other collegiate programs, and international programs such as U Sports in Canada do not provide even remotely comparable opportunities to compete and earn NIL revenue as is available to them in Division I. Coach McCurry further testified that much of his time is spent recruiting student-athletes, and the better facilities, budgets, gear, and coaches in Division I, as well as the highest levels of competition and increased opportunity to revenue share and earn NIL deals, are some of the most important consideration for these student-athletes. For these reasons, most student-athletes he recruits only look to compete at Division I schools. Such observations are consistent with the commercial realities of the industry identified in the Tatos Declaration.

The Court also heard testimony from Coach McCurry and Plaintiffs that professional leagues for cross country athletes do not exist, and there are no professional track and field leagues in the United States. Only a small number of international student-athletes go on to compete in international professional track and field leagues. Within the United States, sponsorship opportunities sufficient to fully support a running career are extremely limited to the best of the best. Simply put, there are no legitimate professional or other labor markets within the United States which Plaintiffs could choose over Division I cross country or track and field teams. While Plaintiffs hope to someday qualify for professional sponsorships, Plaintiffs cannot merely choose to replicate the educational, competitive, and earning opportunities available to them in Division I cross country and/or track and field. In short, substitutions for NCAA Division I cross country and track and field do not exist.

The NCAA argues Mr. Tatos failed to provide evidence in support of his conclusions on three grounds: first, he improperly referenced sports other than cross country and track and field when defining the relevant market; second, he included only marginal evidence for the submarket track and field; and third, he failed to employ any of the "widely-accepted tools that economists use to define the boundaries of a relevant market and a firm's power within that market," such as a hypothetical monopolist test ("HMT"). Dkt. 28, at 5–8. The Court finds these arguments unpersuasive.

In *Blythe*, the Ninth Circuit held that when defining the relevant market as the Division I collegiate baseball market, the district court improperly relied on *Alston* and other district courts that relied on *Alston* to define college football or basketball labor

markets. 190 F.4th at 864–65. The Ninth Circuit held this was improper because "[t]hese markets are not interchangeable." *Id.* at 865. But that is not what Mr. Tatos does. The first part of Plaintiffs' market definition is "NCAA Division I intercollegiate athletics." Dkt. 21-2, at 9. Mr. Tatos's discussion of sports outside of cross country and track and field relates to this initial, broader definition of the relevant market, showing that Division II and III athletics are not substitutes for Division I athletics, and professional sports leagues do not discipline the NCAA's monopsony power over Division I sports. *Id.* at 24–31. Mr. Tatos did not suggest all Division I athletics are interchangeable; instead, his declaration is evidence that for Division I athletics, the NCAA exercises monopsony power over the buyers (i.e., Division I university teams), who purchase student-athletic services in the submarkets of individual sports. *See Wisne*, -- F.4th --, 2026 WL 3368646, at *9. Within his discussion, Mr. Tatos provides sport-specific data for the track and field submarket and explains that cross country does not have comparable extra-collegiate data to analyze. *Id.* at 24–26. He does not rely on other sports to define the relevant submarkets.

Next, and more importantly, though the NCAA is dissatisfied with the amount of data Mr. Tatos included to support his submarket definition for cross country and track and field, it admits that Mr. Tatos did provide evidence of those submarkets. *See* Dkt. 28, at 5. The Ninth Circuit stated a district court's analysis of the relevant market must be more than "cursory" and based on "concrete evidence," *Blythe*, 190 F.4th at 865, but it did not define the amount of evidence sufficient to meet that standard. *See, e.g.*, *Robinson*, 172 F.4th at 294 ("We are not specifying the exact quantity of evidence required for an antitrust plaintiff to meet their burden of proof to establish market definition to be granted a preliminary

injunction.”). Here, the Tatos Declaration and testimony presented at the hearing provide concrete evidence of Plaintiffs’ proffered market definition, including the lack of substitutes for Division I cross country and track and field.[16] What’s more, the Court finds that Mr. Tatos *did* answer several if not all the relevant questions set forth in footnote four in *Blythe*. *See* 190 F.4th at 864 n.4.

Lastly, the Court finds Mr. Tatos’ explanation for why he did not perform a formal HMT satisfactory. Mr. Tatos explains the HMT “should be conducted under competitive conditions,” and that failing to do so “risk[s] falling prey to the Cellophane Fallacy and erroneously interpreting substitution levels as evidence of a broader market than one exists.” Dkt. 21-2, at 32. No substitutes exist for Plaintiffs to both complete their studies and compete at the highest level in their sport, and in any case only the NCAA has access to the data that would be required to conduct an HMT. *Id.* At oral argument, Mr. Tatos testified that when direct evidence of monopsony power exists, running the HMT or other economic tests of market power (i.e., using indirect evidence) is superfluous. *See* Dkt. 40, at 158–59.

Dr. Backus states the HMT is the “gold standard approach for defining relevant markets,” and that Mr. Tatos is “assuming his conclusion” that no substitutions exist for

[16] The NCAA also argues the data Mr. Tatos offers indicates his market definition “is both overinclusive and geographically underinclusive” because most Division I track and field athletes who competed in the 2024 Paris Olympics come from a subset of Division I schools, and many other competed for their home countries outside the United States. But even if most of the track and field athletes who represented the United States at the Paris Olympics came from a smaller subset of Division I schools, that does not negate Mr. Tatos’s data that Division I produces nearly all Olympic track and field athletes. And the fact that some Division I track and field athletes competed at the Olympics for their home countries does not indicate that viable substitutions exist for these athletes in those countries.

cross country and track and field Division I athletes. Dkt. 28-1, at 42–43. The Court is unpersuaded. First, the Ninth Circuit does not require any particular economic test to perform a fact-specific assessment of the relevant market. Second, Mr. Tatos did not simply assume no market outside Division I cross country or track and field existed but provided evidence—bolstered by his own testimony and that of Coach McCurry and Plaintiffs—to that effect. And third, Dr. Backus does not actually state the HMT should have been conducted or that it would be feasible here—only that Mr. Tatos's conclusion that conducting an HMT is infeasible over concerns about the Cellophane Fallacy is incorrect.

Considering all the written and oral evidence, the Court finds the Tatos Declaration and testimony given at the hearing provide concrete evidence sufficient to define the relevant markets as NCAA Division I cross country and track and field teams.

*iii. Anticompetitive Effect*

Having defined the relevant markets, the Court now turns to determining whether the Five-in-Five Rule has an anticompetitive effect on the relevant markets. Plaintiffs bear the initial burden to "prove that the challenged restraint"—the Five-in-Five Rule—"has a substantial anticompetitive effect that harms consumers in the relevant market." *Am. Express Co.*, 585 U.S. at 541. Under *Blythe*, Plaintiffs must show the [Five-in-Five] Rule "creates, protects, or enhances the NCAA's dominant position in the market—and thus the NCAA's ability to depress student-athlete compensation below the competitive level—by making it more difficult for the NCAA's existing or potential rivals to compete against the NCAA." 190 F.4th at 866 (quoting *Forqurean v. NCAA*, 143 F.4th 859, 870 (7th Cir.

2025)). Personal injury, without more, does not demonstrate anticompetitive effect on the market. *Id.* at 867.

Mr. Tatos focuses his analysis of anticompetitive effect on the exclusion of the high school class of 2022 from the Five-in-Five Rule. Dkt. 21-2, at 32. He explains their exclusion "results in a reduction in choice for Division I colleges and universities that harms competition across Division I sports generally and in the submarkets of cross country and track and field specifically." *Id.* Having lost access to experienced, athletic talent for which they would otherwise compete, schools are left with a decrease in quality of labor and, as such, decrease student-athlete wages. *Id.* Mr. Tatos further explains it is widely recognized by economists and legal scholars that "limiting choices through commercial restrains harms competition," and the NCAA's implementation of the Five-in-Five Rule cannot be described as anything but a limitation on Division I school's choices. *Id.* at 32–33.

The NCAA argues Mr. Tatos's logic "would invalidate *all* eligibility restrictions in *all* leagues, no matter how fundamental to the nature of the competition." Dkt. 28, at 10. The NCAA cites the 1984 case *Board of Regents*, in which the Supreme Court stated that college athletics is an industry "in which horizonal restraints on competition are essential if the product is to be available at all." 468 U.S. at 101. But the NCAA's concerns are overblown, because "[e]veryone agrees that the NCAA can require student athletes to be enrolled students in good standing." *Alston*, 594 U.S. at 110 (Kavanaugh, J., concurring). What the NCAA overlooks is that Plaintiffs (and similarly situated student-athletes) *are* students in good standing, and they meet all requirements of eligibility enforced by the

NCAA, including the Five-in-Five Rule, if the NCAA didn't unilaterally exclude them from it. The question before the Court is whether the exclusion of the high school class of 2022 from the relevant market under the Five-in-Five Rule violates the Sherman Act. Whether those other restrictions violate the Sherman Act is a question for another day.

The NCAA also contends Mr. Tatos's only evidence of anticompetitive effect is Plaintiffs' own exclusion from the market. Mr. Tatos's conclusions are bolstered by Plaintiffs' experience and testimonies, but he does not rely on them for his opinions. The NCAA's implementation of the Five-in-Five Rule has the effect of excluding student-athletes from the high school class of 2022 from providing a fifth year of athletic labor services, and Division I schools are barred from competing for their services. Specific to cross country and track and field, as discussed above, there are no viable alternative markets to which student-athletes may supply their athletic labor services. The decrease in competition for quality athletic labor services[17] results in depressed wages for Division I cross country and track and field student-athletes.[18]

---

[17] Further, the notion that limiting the supply of workers in a labor market may increase, not decrease, worker compensation does not hold water when considering the actual effect of the Five-in-Five Rule. By and large, student-athletes who are excluded by the Five-in-Five Rule from continuing to provide athletic labor services to Division I schools are those with the most experience in their respective sports and, as such, command higher wages. The overall "quality" of student-athlete laborers is reduced when excluding those with the most experience. This has the effect of keeping aggregate wages for student-athletes suppressed, independent of the NCAA's cap on revenue sharing.

[18] In his declaration, Dr. Backus states that "[t]ransfers of wealth between individuals on the same side of the market . . . do not represent anticompetitive harm." Dkt. 28-1, at 46. But he ignores the harm that results from the decrease in quality student-athlete laborers for whom Division I member institutions compete. That there are more student-athletes willing to compete in Division I than there are roster spots available may be true, but not all student-athletes are the same. By excluding the most experienced class of student-athletes from the pool of laborers colleges compete for, the overall quality of the laborers left is diminished.

Dr. Backus argues that "there is a legitimate interest in having rules that define and preserve the NCAA product and create opportunities for eligible student-athletes." Dkt. 28-1, at 50. The Court agrees, so long as those rules (and the implementation of those rules) do not violate established antitrust laws. Student-athletes are laborers within the NCAA Division I intercollegiate athletics market in their respective sport, and Plaintiffs want to participate in the submarkets of cross country and track and field. But the NCAA restricts its member institutions from competing for their athletic services simply because it chose to not include Plaintiffs in the new Five-in-Five Rule. There is no legitimate interest the NCAA has in excluding this cohort of student-athletes, who otherwise are eligible to compete in all other respects.[19] The Court finds Plaintiffs have supplied sufficient evidence to show the NCAA's implementation of the Five-in-Five Rule as to Division I cross country and track and field student-athletes in the high school class of 2022 has substantial anticompetitive effect on the relevant markets.

*iv. Procompetitive Rationale*

The NCAA elected not to provide a procompetitive rationale for excluding Plaintiffs from the Five-in-Five Rule in their response briefs. *See generally* Dkts. 20, 28. As such, the Court finds Plaintiffs have met their burden under the rule of reason analysis and are likely to succeed on their Sherman Act claim.

---

[19] To the extent the NCAA argues it has reliance interests in the existing 2026–27 cohort, where were those interests when the NCAA granted a similar exception to student-athletes who were competing during the COVID-19 pandemic, or to those future cohorts who will compete against current athletes who *are* granted that additional year? *See Lorient*, 2026 WL 2958759, at *18.

**D. The Remaining *Winter* Factors**

*1. Irreparable Harm*

As stated above, Plaintiffs "are likely to suffer harm if they are unable to compete." Dkt. 19, at 14. *See Ohio*, 706 F. Supp. 3d at 597 (listing cases where courts held lost opportunity to participate in collegiate sports is irreparable harm). The lead case the NCAA cites for the proposition that courts "routinely reject[] the notion that a student suffers irreparable harm by not being permitted to participate in interscholastic athletics" involved a minor child, not a Division I student-athlete. *See McGee v. Va. High Sch. League, Inc.*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011); *Dziewa v. Pa. Interscholastic Athletic Ass'n*, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009) (discussing high school interscholastic athletic competition). And the student-athlete in *Hall v. NCAA* was at the beginning of his college career, not the end as are Plaintiffs. *See* 985 F. Supp. 782, 800 (N.D. Ill. 1997). While the courts in *Johnson v. NCAA* and *Stedman v. NCAA* both found that "[h]arm to exposure, development, and visibility is not irreparable," *see* 2025 WL 3145866, at *7 (S.D. Ohio Nov. 11, 2025); 2026 WL 637660, at *7 (S.D. Fla. Jan. 22, 2026), other courts have found lost opportunities to compete and receive scholarship funds to be irreparable, *see Ohio*, 706 F. Supp. 3d at 597; *Pavia*, 760 F. Supp. 3d at 544; *Braham*, 794 F. Supp. 3d at 837; *Blythe v. NCAA*, 2026 WL 483345, at *6 (D. Nev. Feb. 20, 2026), *vacated by* 2026 WL 2494580 (9th Cir. Apr. 8, 2026); *Martinson*, 804 F. Supp. 3d at 1131.

The Court agrees with the latter group. Lost opportunities to compete, improve competitive performance, and gain visibility for potential sponsors and professional

opportunities cannot be remedied through compensatory damages. Thus, Plaintiffs have shown they face immediate, irreparable harm if preliminary relief is not granted.

*2. Balance of Hardship and Public Interest*

In its order denying Plaintiffs' TRO, the Court held the following:

> The balance of hardship also tips (slightly) in Robertson and Novak-Klotz's favor because each stands to lose competitive experience and potentially miss out on NIL and sponsorship opportunities, while the NCAA would be minimally harmed if Robertson and Novak-Klotz compete. However, the harm to Robertson and Novak-Klotz appears to be mitigated by the fact that both student-athletes are still members of, and work out with, BSU's track and field team, and thus they still have opportunities to compete in Division I and earn NIL and sponsorship revenues during the 2026–27 academic year via the track and field team. For similar reasons, it appears the public interest is not necessarily served by granting the TRO because Robertson and Novak-Klotz will still be able to continue working toward earning their degrees.

Dkt. 19, at 14. The Court finds the same holds true for all Plaintiffs. At most, these factors are neutral in the *Winter* analysis.

Considering Plaintiffs' likelihood of success on the merits of their breach of contract and Sherman Act claims, and the irreparable harm Plaintiffs will suffer if they are not permitted to compete, the Court finds the *Winter* factors weigh heavily in favor of granting the preliminary injunction.

**E. The Rule of Restitution and Bond**

Plaintiffs also ask the Court to enjoin the NCAA's Rule of Restitution[20] and not require Plaintiffs to post a bond. The NCAA has not opposed either request. For the Court's

[20] NCAA Division I Bylaw 12.9.4.2, the Rule of Restitution, states:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against

preliminary injunction order to be meaningful, "the NCAA must be prevented from punishing [Plaintiffs] . . . for obtaining it." *Martinson v. NCAA*, 804 F. Supp. 3d 1109, 1133 (D. Nev. 2025), *vacated as moot by Braham v. NCAA*, 2026 WL 2653095 (9th Cir. Sept. 9, 2026); *see also Ohio*, 706 F. Supp. 3d at 601 ("The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is in fact a measure designed to inhibit a person's access to the courts."); *Pavia*, 760 F. Supp. 3d at 545 (enjoining the NCAA from enforcing the Rule of Restitution). As such, the Court will enjoin the NCAA from enforcing the Rule of Restitution against Plaintiffs, their coaches, or BSU for allowing Plaintiffs to compete in the 2026–27 cross country and/or indoor track and field seasons. Concerning Plaintiffs request to not require a bond, it does not appear the NCAA will suffer damages if the injunction is issued, and the NCAA does not suggest otherwise. Accordingly, the Court finds no bond is necessary.

## V. CONCLUSION

For the reasons set forth above, Plaintiffs have shown a likelihood of success on their breach of contract and Sherman Act claims and will suffer irreparable harm if they are unable to compete in the 2026–27 cross country and/or indoor track and field seasons. The Court therefore grants their Motion. To ensure the Court's order is given teeth, the

---

> the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions . . . .

Dkt. 20-2, at 59. Potential punishments include vacating wins, post-season bans, ordering return of television revenue, and other financial penalties. *Id.*

Court enjoins the NCAA from enforcing the Rule of Restitution against Plaintiffs, their coaches, or BSU for permitting Plaintiffs to compete in the 2026 – 27 cross country and/or indoor track and field seasons. Plaintiffs are not required to post a bond.

DATED: November 12, 2026

David C. Nye
U.S. District Court Judge